# JURAGUA IRON COMPANY, LIMITED, *v.* UNITED STATES.

## APPEAL FROM THE COURT OF CLAIMS.

No. 34. Argued December 2, 3, 1908.—Decided February 23, 1909.

No action can be maintained against the United States for the destruction or taking of property under the Tucker Act of March 3, 1887, c. 359, 24 Stat. 505, unless the United States is bound by express or implied contract to compensate the owner therefor or unless the case be one not sounding in tort.

Under the recognized rules of war Cuba, being a part of Spain, was during the war of 1898–9, enemy country; and all persons residing in Cuba pending the war were to be deemed enemies whatever their nationality, including citizens of the United States there domiciled and doing business.

Property of citizens of the United States in Cuba was during the war with Spain to be regarded as enemy property subject to the laws of war, and to be destroyed whenever military necessity so demanded; nor could a citizen of the United States invoke the protection of the Constitution pending the war for his property in Cuba any more than could a Spanish subject.

A citizen of the United States domiciled in Cuba cannot maintain an action against the United States under the act of March 3, 1887, in the Court of Claims for the value of property destroyed during, and as the result of, military operations in Cuba by order of the commanding officer in the field as there is no obligation based on implied contract to compensate for the value of such property. If the order was not justified by the rules of war it would amount to a tort, and the action based thereon would be one sounding in tort, and the action cannot be maintained.

*Quære,* and not decided, whether the act of March 3, 1887, c. 359, 24 Stat. 505, supersedes or modifies § 1066, Rev. Stat., and § 9 of the act of March 3, 1863, c. 92, 12 Stat. 767, relating to claims against the United States growing out of, or dependent on, treaty stipulations.

42 C. Cl. 99, affirmed.

THE facts are stated in the opinion.

*Mr. Frederic D. McKenney* and *Mr. John Spaulding Flannery*, with whom *Mr. Wayne MacVeagh* and *Mr. William Hitz* were on the brief, for appellant:

The war with Spain was not against Cuba nor against the Cuban people, nor against aliens domiciled or found within its borders and there engaged in the peaceful pursuits of commerce. It was a war solely against Spain, undertaken by the United States because of the abhorrent conditions which had been brought about in Cuba by Spain and which could not longer be endured. It was undertaken by the United States in the interest of Cuba and on behalf of her peoples, and because those people were and of right ought to be free and independent, and because it was the duty of the United States to demand that the government of Spain at once relinquish its authority and government in the island of Cuba and withdraw its land and naval forces from Cuba and Cuban waters. See *Neely v. Henkel,* 180 U. S. 109.

But even if this were not all so, and if the mere *situs* of the claimants' property within the territorial sovereignty of the enemy stamped it as "enemy property," nevertheless, under well-recognized principles of modern international law, as well as under the modern military law governing the armies of the United States in the field, and binding as well upon the Government as upon those who become subject to its power, the Juragua Iron Company became and is entitled to compensation for its property so seized and destroyed. Article 38, § 11, General Orders, No. 100; General Orders, No. 101.

General Orders, No. 101, promulgated through the War Department by President McKinley, did not announce any new principle either of law or liability. It merely reiterated certain well-understood principles of international law, founded in equity and moral right and accepted and acted upon by all civilized nations. It was scarcely more than a reiteration in condensed form, of Lieber's instructions, as proclaimed by direction of President Lincoln in 1863 in General Orders, No. 100; afterwards adopted by the United German Empire

for the government and regulation of its armies; formulated
into a code by Bluntschli; made the basis of the Brussels agree-
ment of 1879; adopted by The Hague convention of 1899 and
latterly reannounced, practically in its original form in The
Hague convention of 1907 "with respect to the laws and cus-
toms of war on land," to the last two of which conventions the
United States has formally indicated their adherence.    See
*Hilton* v. *Guyot,* 159 U. S. 113, 163; *Fremont* v. *United States,* 17
How. 542, 557; *The Scotia,* 14 Wall. 170, 188; *Respublica* v.
*De Longchamps,* 1 Dall. 111, 116; *Moultrie* v. *Hunt,* 23 N. Y. 394,
396; *The Paquete Habana,* 175 U. S. 677, 700, 701.

The obligation of a belligerent to pay for private property
taken or destroyed under circumstances not involving actual
military operations—that is, in battle, or the course of bom-
bardment, and the like—is recognized and declared by prac-
tically all text-writers who have treated of the subject.    Kent's
Commentaries, 92, 93; Hall's International Law, 441, 442; 2
Halleck's International Law, 68; Treatise on International
Law, by Cushman K. Davis, 144–146.    See also dissenting opin-
ion of Commissioner Maury (Spanish Treaty Claims Commis-
sion) in case of *Juragua Iron Co.* v. *United States; Mitchell* v.
*Harmony,* 13 How. 115; *McKenna* v. *Fisk,* 1 How. 241; *United
States* v. *Russell,* 13 Wall. 623; *United States* v. *Pacific R. R. Co.,*
120 U. S. 227; *Putegnat Heirs* (Mexican Claims Commission), 4
Moore's International Arbitrations, 3718; *Grant* v. *United States,*
1 C. Cls. 41; *United States* v. *Lynah,* 188 U. S. 445.

*Mr. Assistant Attorney General Thompson,* for appellee:

Under stress of military necessity, invading forces may use
or destroy both public and private property for purposes of
prosecuting war, provided that they do not commit wanton
damage.    The property of a foreigner situated within a state
where military operations are being pressed becomes an ele-
ment of strength to the state and may be treated as hostile by
an enemy.    Hall's International Law (5th ed.), pp. 471, 472,
474, 481; War Power under the Constitution, by William Whit-

ing (2d ed.), p. 342; 2 Halleck's International Law, pp. 75–77; *The Cheshire*, 3 Wall. 233; *The Gray Jacket*, 5 Wall. 369, 370; *Miller* v. *United States*, 11 Wall. 305, 306; *Lamar* v. *Browne*, 92 U. S. 187, 194; *Dow* v. *Johnson*, 100 U. S. 170; *Hijo* v. *United States*, 194 U. S. 315; *United States* v. *Pacific R. R.*, 120 U. S. 228; *The Venice*, 2 Wall. 258; *The Venus*, 8 Cranch, 277; *Bagaley*, 5 Wall. 408; *Young* v. *United States*, 97 U. S. 60; *Hamilton* v. *Dillon*, 21 Wall. 94.

Any standing this appellant may have in the Court of Claims or in this court must find its basis and authority in the first section of what is commonly termed the Tucker Act, of March 3, 1887, to provide for the bringing of suits against the Government of the United States. 24 Stat. 505.

The claim in this case is not founded on the Constitution of the United States or on any act of Congress; neither does it find its basis in any regulation of an executive department, nor can it be said to be founded on a contract, either expressed or implied. Indeed, there is no element of contract in the case, for nothing was done by the United States nor anything said by any of its officers from which could be implied an agreement or obligation on the part of the Government to pay for the property destroyed. See *Hijo* v. *United States*, 194 U. S. 315.

This appellant company having established a commercial domicil in Spanish territory, such as has been shown by the facts in this case, certainly is not entitled to recover under the plea of implied contract for property destroyed under such circumstances as set forth in the record.

There is no provision in the act of March 3, 1887, whereby appellant can successfully maintain its action. The seizure and destruction may have made a case sounding in tort, but it is not one of contract, either expressed or implied.

Mr. Justice Harlan delivered the opinion of the court.

This action was brought in the Court of Claims to recover from the United States the alleged value of certain property

destroyed in Cuba, during the war with Spain, by order of the officer who at the time of its destruction commanded the troops of the United States operating in the locality of the property.

The case depends altogether upon the facts found by the court. We cannot go beyond those facts.

The Court of Claims found that the Juragua Iron Company (Limited) was a corporation of Pennsylvania, having its principal office and place of business in Philadelphia and was and for many years had been engaged in the business of mining and selling iron ore and other mineral products in the United States, Cuba and elsewhere and in manufacturing iron and steel products; that it was so engaged at the opening of the late war with Spain; and to enable it to carry on business it owned, leased and operated mines in Cuba, maintaining offices, works and the necessary tools, machinery, equipments and supplies for its business in the Province of Santiago de Cuba, at or near Siboney, Firmeza and La Crux; that in addition to its mines, works and their equipments, the company also owned real estate at or near Siboney, which was improved by 66 buildings of a permanent character, used for the purposes of its business and occupied by its employés as dwellings and for other purposes; that in the year 1898, and "while the war with Spain was in progress, the lives of the United States troops who were engaged in military operations in the Province of Santiago de Cuba, in the belligerent prosecution of the war, became endangered by the prevalence of yellow fever, and it was deemed necessary by the officers in command, in order to preserve the health of the troops and to prevent the spread of the disease, to destroy all places of occupation or habitation which might contain the fever germs;" that on or about the eleventh of July, 1898, General Miles, commanding the United States forces in Cuba, because of the necessity aforesaid and by the advice of his medical staff, issued orders to destroy by fire these 66 buildings at Siboney, which belonged to the claimant and had been used for the purposes aforesaid; that pursuant to that order such buildings and their contents were destroyed by fire by the military authorities of

the United States; that the reasonable value of the buildings at the time and place of destruction was $23,130, and the reasonable value of the drills, furniture, tools and other personal property so destroyed by fire was seven thousand nine hundred and eighty-six dollars ($7,986), making a total of thirty-one thousand one hundred and sixteen dollars ($31,116).

As a conclusion of law the court found that the United States was not liable to pay any sum to the plaintiff on account of the damage aforesaid and dismissed the petition.

It is to be observed at the outset that no fact was found that impeached the good faith, either of General Miles or of his medical staff, when the former, by the advice of the latter, ordered the destruction of the property in question; nor any fact from which it could be inferred that such an order was not necessary in order to guard the troops against the dangers of yellow fever. It is therefore to be assumed that the health, efficiency and safety of the troops required that to be done which was done. Under these circumstances was the United States under any legal obligation to make good the loss sustained by the owner of the property destroyed?

By the act of March 3d, 1887, providing for the bringing of suits against the Government of the United States the Court of Claims was given jurisdiction to hear and determine all claims "founded upon the Constitution of the United States or any law of Congress, except for pensions, or upon any regulation of an Executive Department or upon any contract, expressed or implied, with the Government of the United States or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect to which claims the party would be entitled to redress against the United States, either in a court of equity or admiralty if the United States were suable. 24 Stat. 505, c. 359.

Manifestly, no action can be maintained under this statute unless the United States became bound by *implied* contract to compensate the plaintiff for the value of the property destroyed, or unless the case—regarding it as an action to recover damages—be one "*not* sounding in *tort.*"

The plaintiff contends that the destruction of the property by order of the military commander representing the authority and power of the United States was such a taking of private property for public use as to imply a constitutional obligation, on the part of the Government, to make compensation to the owner. Const. Amend. V. In support of that view it refers to *United States* v. *Great Falls Mfg. Co.*, 112 U. S. 645, 656; *Great Falls Mfg. Co.* v. *Attorney General*, 124 U. S. 581, 597–8; *United States* v. *Lynah*, 188 U. S. 445. Let us examine those cases.

*United States* v. *Great Falls Mfg. Co.*, 112 U. S. 645, 656, was a case of the taking for public use by agents and officers of the United States proceeding under the authority of an act of Congress of certain private property—lands, water rights and privileges—which were held and used by the Government for nearly twenty years, without any compensation being made to the owner. A suit was brought against the United States in the Court of Claims, and judgment was rendered for the claimant. This court said: "It seems clear that these property rights have been held and used by the agents of the United States under the sanction of legislative enactments by Congress; for the appropriation of money specifically for the construction of the dam from the Maryland shore to Conn's Island was, all the circumstances considered, equivalent to an express direction by the legislative and executive branches of the Government to its officers to take this particular property for the public objects contemplated by the scheme for supplying the capital of the Nation with wholesome water. The making of the improvements necessarily involves the taking of the property; and if, for the want of formal proceedings for its condemnation to public use, the claimant was entitled, at the beginning of the work, to have the agents of the Government enjoined from prosecuting it until provision was made for securing in some way payment of the compensation required by the Constitution—upon which question we express no opinion—there is no sound reason why the claimant might not waive that right, and, electing to regard the action of the Government as a taking un-

der its sovereign right of eminent domain, demand just compensation. *Kohl* v. *United States,* 91 U. S. 367, 374. In that view we are of opinion that the United States, having by its agents, proceeding under the authority of an act of Congress, taken the property of the claimant for public use, are under an obligation, imposed by the Constitution, to make compensation. The law will imply a promise to make the required compensation, where property, to which the Government asserts no title, is taken, pursuant to an act of Congress, as private property to be applied for public uses. Such an implication being consistent with the constitutional duty of the Government, as well as with common justice, the claimant's cause of action is one that arises out of implied contract, within the meaning of the statute which confers jurisdiction upon the Court of Claims of actions founded ' upon any contract, express or implied, with the Government of the United States.'"

In reference to the subsequent case of *Great Falls Mfg. Co.* v. *Attorney General,* 124 U. S. 581, 597, it may be said that so far as it has any bearing upon the present controversy it reaffirms the principle announced in *United States* v. *Great Falls Mfg. Co.,* 112 U. S. 645, 656. The court said: "It is sufficient to say that the record discloses nothing showing that he [the Secretary of War] has taken more land than was reasonably necessary for the purposes described in the act of Congress, or that he did not honestly and reasonably exercise the discretion with which he was invested; and, consequently, the Government is under a constitutional obligation to make compensation for any property or property right taken, used, and held by him for the purposes indicated in the act of Congress, whether it is embraced or described in said survey or map, or not. . . . Even if the Secretary's survey and map, and the publication of the Attorney General's notice did not, in strict law, justify the former in taking possession of the land and water rights in question, it was competent for the company to waive the tort, and proceed against the United States, as upon an implied contract, it appearing, as it does here, that the Government recognizes and

retains the possession taken in its behalf for the public purposes, indicated in the act under which its officers have proceeded."

In *United States* v. *Lynah,* 188 U. S. 445, 464-5, which involved the inquiry whether the injury done to certain lands as the result of work done on the Savannah River by the United States was a taking of private property for public use, the court said: "The rule deducible from these cases is that when the Government appropriates property which it does not claim as its own it does so under an implied contract that it will pay the value of the property it so appropriates. . . . So the contention that the Government had a paramount right to appropriate this property may be conceded, but the Constitution in the Fifth Amendment guarantees that when this governmental right of appropriation—this asserted paramount right—is exercised it shall be attended by compensation. . . . Whenever in the exercise of its governmental rights it takes property, the ownership of which it concedes to be in an individual, it impliedly promises to pay therefor."

It is clear that these cases lend no support to the proposition that an implied *contract* arose on the part of the United States to make compensation for the property destroyed by order of General Miles. The cases cited arose in a time of peace and in each it was claimed that there was within the meaning of the Constitution an actual taking of property for the use of the United States, and that the taking was by authority of Congress. That taking, it was adjudged, created by implication an obligation to make the compensation required by the Constitution. But can such a principle be enforced in respect of property destroyed by the United States in the course of military operations for the purpose, and only for the purpose, of protecting the health and lives of its soldiers actually engaged at the time in war in the enemy's country? We say "enemy's country" because, under the recognized rules governing the conduct of a war between two nations, Cuba, being a part of Spain, was enemy's country, and all persons, whatever their nationality, who resided there were, pending such war, to be

deemed enemies of the United States and of all its people. The plaintiff, although an American corporation, doing business in Cuba, was, during the war with Spain, to be deemed an enemy to the United States with respect of its property found and then used in that country, and such property could be regarded as enemy's property, liable to be seized and confiscated by the United States in the progress of the war then being prosecuted; indeed, subject under the laws of war to be destroyed whenever, in the conduct of military operations, its destruction was necessary for the safety of our troops or to weaken the power of the enemy.

In *Miller* v. *United States*, 11 Wall. 268, 305, the court, speaking of the powers possessed by a nation at war, said: "It is sufficient that the right to confiscate the property of all public enemies is a conceded right. Now, what is the right, and why is it allowed? It may be remarked that it has no reference whatever to the personal guilt of the owner of confiscated property, and the act of confiscation is not a proceeding against him. The confiscation is not because of crime, but because of the relation of the property to the opposing belligerent, a relation in which it has been brought in consequence of its ownership. It is immaterial to it whether the owner be an alien or a friend, or even a citizen or subject of the power that attempts to appropriate the property. In either case the property may be liable to confiscation under the rules of war. It is certainly enough to warrant the exercise of this belligerent right that the owner be a resident of the enemy's country, no matter what his nationality." In *Lamar's Ex'r* v. *Browne*, 92 U. S. 187, 194, the court said: "For the purposes of capture, property found in enemy territory is enemy property, without regard to the status of the owner. In war, all residents of enemy country are enemies." "All property within enemy territory," said the court in *Young* v. *United States*, 97 U. S. 39, 60, "is in law enemy property, just as all persons in the same territory are enemies. A neutral owning property within the enemy's lines holds it as enemy property, subject to the laws of war; and if it be hostile prop-

erty, subject to capture." Referring to the rules of war between independent nations as recognized on both sides in the late Civil War, the court, in *United States v. Pacific Railroad Co.*, 120 U. S. 227, 233, 239, said: "The rules of war, as recognized by the public law of civilized nations, became applicable to the contending forces. . . . The inhabitants of the Confederate States on the one hand and of the States which adhered to the Union on the other became enemies, and subject to be treated as such, without regard to their individual opinions or dispositions; while during its continuance commercial intercourse between them was forbidden, contracts between them were suspended, and the courts of each were closed to the citizens of the other. *Brown v. Hiatts*, 14 Wall. 177, 184. . . . More than a million of men were in the armies on each side. The injury and destruction of private property caused by their operations, and by measures necessary for their safety and efficiency, were almost beyond calculation. For all injuries and destruction which followed necessarily from these causes no compensation could be claimed from the Government. By the well-settled doctrines of public law it was not responsible for them. . . . The principle that, for injuries to or destruction of private property in necessary military operations during the civil war, the Government is not responsible, is thus considered established. Compensation has been made in several such cases, it is true; but it has generally been, as stated by the President in his veto message, 'a matter of bounty rather than of strict legal right.'" See also *The Venus*, 8 Cranch, 253, 278; *The Venice*, 2 Wall. 258, 275; *The Cheshire*, 3 Wall. 231, 233; *The Gray Jacket*, 5 Wall. 342, 345, 369; *The Friendschaft*, 4 Wheat. 105, 107; *Griswold v. Waddington*, 16 Johns. 438, 446-7; Vattel, b. 3, c. 5, § 70, and c. 4, § 8; Burlamaqui, Pt. 4, c. 4, § 20.

So in Hall's International Law, 5th ed., 500, 504, 533: "A person though not a resident in a country may be associated with it through having or being a partner in a house of trade as to be affected by its enemy character, in respect at least of the

property which he possesses in the belligerent territory." In Whiting's War Powers Under the Constitution, 340, 342, the author says: "A foreigner may have his personal or permanent domicile in one country, and at the same time his constructive or mercantile domicile in another. The national character of a merchant, so far as relates to his property engaged in trade, is determined by his commercial domicile. 'All such persons . . . are *de facto* subjects of the enemy sovereign, being residents within his territory, and are adhering to the enemy so long as they remain within his territory.' .. . . A neutral, or a citizen of the United States, domiciled in the enemy's country, not only in respect to his property, but also as to his capacity to sue, is deemed as much an alien enemy as a person actually born under the allegiance and residing within the dominions of the hostile nation."

In view of these principles—if there were no other reason— the plaintiff corporation could not invoke the protection of the Constitution in respect of its property used in business in Cuba, during the war, any more than a Spaniard residing there could have done, under like circumstances, in reference to his property then in that island. If the property destroyed by order of General Miles had belonged at the time to a resident Cuban, the owner would not have been heard in any court, under the facts found, to claim, as upon implied contract, compensation from the United States on account of such destruction. How then under the facts found could an obligation, based on implied contract, arise under the Constitution in favor of the plaintiff, an American corporation, which at the time and in reference to the property in question had a commercial domicil in the enemy's country? It is true that the army, under General Miles, was under a duty to observe the rules governing the conduct of independent nations when engaged in war—a duty for the proper performance of which the United States may have been responsible in its political capacity to the enemy government. If what was done was in conformity to those rules—as upon the facts found we must assume that it was—then the

owner of the property has no claim of any kind for compensation or damages; for, in such a case the Commanding General had as much right to destroy the property in question if the health and safety of his troops required that to be done, as he would have had if at the time the property had been occupied and was being used by the armed troops of the enemy for hostile purposes. In the circumstances disclosed by the record it cannot reasonably be said that there was, in respect of the destruction of the property in question, any "convention between the parties," any "coming together of minds," or any circumstances from which a *contract* could be implied. *Russell v. United States,* 182 U. S. 516, 530; *Harley v. United States,* 198 U. S. 229, 234. Again, if, as contended—without, however, any basis for the contention—the acts of that officer were not justified by the laws of war, then the utmost that could be said would be that what was done pursuant to his order amounted to a tort, and a claim against the Government for compensation on account thereof would make a case "sounding in tort." But of such a case the court would, of course, have no jurisdiction under the act of Congress.

In this connection we may refer to *Hijo v. United States,* 194 U. S. 315, 322, in which the United States was sued by a Spanish corporation for the value of the use of a merchant vessel taken by the United States in the port of Porto Rico, when that city was captured by our army and navy on July 28th, 1898, and kept and used by the Quartermaster's Department for some time thereafter. The court said: "There is no element of contract in the case; for nothing was done by the United States, nor anything said by any of its officers, from which could be implied an agreement or obligation to pay for the use of the plaintiff's vessel. According to the established principles of public law, the owners of the vessel being Spanish subjects, were to be deemed enemies, although not directly connected with military operations. The vessel was therefore to be deemed enemy's property. It was seized as property of that kind, for the purposes of war, and not for any purposes of gain."

After observing that the case did not come within the principle announced in *United States* v. *Great Falls Mfg. Co.*, 112 U. S. 645, 656, the court proceeded: "The seizure, which occurred while the war was flagrant, was an act of war occurring within the limits of military operations. The action, in its essence, is for the recovery of damages, but as the case is one sounding in tort no suit for damages can be maintained under the statute against the United States. It is none the less a case sounding in tort, because the claim is in form for the use of the vessel after actual hostilities were suspended by the protocol of August 12, 1898. A state of war did not in law cease until the ratification in April, 1899, of the treaty of peace. . . . If the original seizure made a case sounding in tort, as it undoubtedly did, the transaction was not converted into one of implied contract, because of the retention and use of the vessel pending negotiations for a treaty of peace."

In our judgment there is no element of contract in the claim of the plaintiff. And even if it were conceded that its property was wrongfully and unnecessarily destroyed under the order of the general commanding the United States troops, the concession could mean nothing more, in any aspect of the case, than that a tort was committed by that officer in the interest of the United States. But, as already said, of a cause of action arising from such a tort the Court of Claims could not take cognizance, whatever other redress was open to the plaintiff.

It may be well to notice one other matter referred to in argument. Section 1066 of the Revised Statutes provided that the jurisdiction of the Court of Claims "shall not extend to any claim against the Government not pending therein on December 1st, 1862, growing out of or dependent on treaty stipulations entered into with foreign nations or with the Indian tribes." Act of March 3, 1863, 12 Stat. 767, c. 92, § 9. We need not now consider or definitely determine whether that section was superseded or modified by the above act of March 3, 1887; for, if it was, and if an implied contract could in any case arise from a treaty stipulation, there is nothing in any treaty with Spain

which stood in the way of the destruction of the buildings in question under the circumstances stated in the findings without liability on the part of the United States for their value; and if that section was not superseded or modified, then the law is for the United States, because of the absence of any implied contract entitling the plaintiff, under the facts found, to be compensated for the loss sustained by it.

Having noticed all the questions that require consideration and finding no error in the record, the judgment of the Court of Claims must be affirmed.

*It is so ordered.*