Johannes PETER, Binton
Abraham, et al.

v.

The UNITED STATES.

No. 461–82L.

United States Claims Court.

Nov. 30, 1984.

David R. Anderson, Washington, D.C., for plaintiffs; Andrew B. Weissman, Jonathan I. Feil, Thomas G. Mattson, and Wilmer, Cutler & Pickering, Washington, D.C., of counsel.

Lois J. Schiffer, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, for defendant; Wendy B. Jacobs, Dept. of Justice, Washington, D.C., of counsel.

## MEMORANDUM OF DECISION

HARKINS, Judge.

This is one of 14 cases filed in the United States Court of Claims as a result of the United States nuclear testing program in the Marshall Islands during the period June 30, 1946, until August 18, 1958. It is before the court on defendant's motion to dismiss. A Memorandum of Decision filed October 5, 1984, in a related case, *Tomaki Juda, et al.,* 6 Cl.Ct. 441, contains general information about the procedural posture of these cases, the nuclear testing program, and the status of United States political relationships in Micronesia. This information (Memorandum, pp. 443–446) applies to the claims in this case.

The complaint in this case was filed on September 15, 1982. For purposes of defendant's motion to dismiss, the facts alleged in the first amended complaint filed November 24, 1982, are taken as true. A summary of the material facts follows.

The complaint names 17 individual plaintiffs who claim on their own behalf and on behalf of a class composed of all persons recognized as the Enewetak people. The class is described as all living persons who were members of the Enewetak community in December 1947, and all living descendants and other persons who by traditional law and custom are recognized as members of the Enewetak people. Currently, more than 700 persons are considered to be members of the Enewetak people.

At this stage, the question of whether this case will proceed as a class action has not been resolved, and defendant reserves its right, if its motion to dismiss is denied,

to oppose certification of the class. In the *Juda* case, the class action issue has been resolved by joinder, as plaintiffs, of all members as of May 1, 1981, of the Bikini community.

Enewetak Atoll is composed of approximately 40 islands which have a combined land area of 2.75 square miles and which enclose a lagoon of approximately 388 square miles. The largest islands are Enewetak Island, with a land area of 321.-86 acres, and Engebi Island, with a land area of 290.58 acres.

The Enewetak people traditionally have been divided into two separate subcommunities, one on Engebi Island and one on Enewetak Island. Members of the two communities historically have intermarried and cooperated in certain economic activities. They now elect a common council. The Enewetak people are governed by the two chiefs (Iroij) of the subcommunities, a Magistrate, an elected Council of 12 members, a Scribe, and a Senator, who represents the Enewetak people in the legislature of the Marshall Islands government. The people of Enewetak historically were economically self-sufficient, on the basis of lagoon fishing, nonintensive agriculture and various gathering activities. Beginning in the early 20th century, copra was produced as an export crop.

In February 1944, American troops captured Enewetak Atoll from the Japanese, which at that time had several thousand personnel on Engebi. On February 24, 1944, the military governor posted Proclamation No. 1. This proclamation notified the civilian inhabitants that existing personal and property rights would be respected and existing laws and customs would remain in force and effect, except "to the extent that it is necessary for me in the exercise of my powers and duties to change them."

In February 1944, the Enewetak people were relocated to a camp on Aomon Island, an island in the atoll. Eventually the total civilian population of the atoll was gathered in this camp. The Army unit left on July 4, 1944; thereafter the Navy, until June 1946, provided all supplies of food, clothing and housing for the Enewetak people. During the period February 1944 to late 1945, the Enewetak people were permitted to reside only on Aomon Island and on the adjacent Bijire Island.

On June 14, 1946, in preparation for the commencement of Operation CROSSROADS, at Bikini Atoll, the entire population of Enewetak Atoll was transported by the Navy to Kwajalein Atoll, where they were housed in temporary facilities and supplied by the Navy. On July 25, 1946, Enewetak Atoll was declared safe; on July 30, 1946, the Enewetak people were returned to Aomon and Bijire Islands at Enewetak Atoll.

During the period of residence at Kwajalein Atoll, United States officials caused the Enewetak people to believe that their removal from Enewetak would be temporary, that they would be able to return to Enewetak at the conclusion of the Bikini nuclear tests, that temporary relocation was necessary to protect them against harm from the tests on Bikini Atoll, and that throughout the relocation their needs for food, shelter, and other necessities would be provided by the United States.

On December 1, 1947, Enewetak Atoll was chosen as the site for the nuclear tests in Operation SANDSTONE and the United States Governor of the Marshall Islands notified the Enewetak people that they would have to leave the atoll. During December 1947, the entire population, with personal belongings, were boarded on a United States Navy LST and were transported to Ujelang Atoll, where they arrived on December 21, 1947. During the period of their relocation on Ujelang Atoll, United States officials caused the Enewetak people to believe that their removal would be temporary, that they would be able to return to Enewetak at the conclusion of the United States use of Enewetak, that relocation was necessary to protect them against harm resulting from U.S. operations, and that throughout the relocation their needs for food, shelter and other necessities would be provided by the United States.

Ujelang Atoll is the westernmost and most geographically isolated of the inhabited atolls and islands that comprise the Marshall Islands. It lies 124 miles southwest of Enewetak Atoll and 617 miles west of Majuro, the administrative center and the major commercial port for the Marshall Islands. Ujelang Atoll has 0.67 square miles of dry land area, 25.47 square miles of lagoon, and is rocky and relatively unproductive for agriculture.

Ujeland resources were inadequate to provide the Enewetak people with a regular supply of food and other material necessities. Infrequent and irregular ship visits resulted in severe shortages of rice, flour and materials needed to repair buildings and boats. By 1952, most of the Enewetak people's sailing canoes were rendered unuseable as a result of severe shortage of sailcloth, paint, fishing net material and hooks. In the mid-1960's, the island's rat population increased greatly and destroyed stored copra and supplies of rice and flour. By 1967, food was so short that the people on Ujelang had only enough for one meal each day.

On October 20, 1967, a Trust Territory ship arrived to find the people on Ujelang with no copra to sell and no money to buy needed food and supplies. Almost all of the nearly 300 people on the atoll boarded the ship and demanded transport to Majuro to protest to the government that they were starving. A Trust Territory official, after 7 hours, radioed for food and agreed to stay on Ujeland until the supply ship returned. The supply ship returned with food on November 3, 1967.

In November 1968, the people on Ujeland were totally out of rice, flour, sugar and other imported goods. In June 1972, a typhoon destroyed the breadfruit crop, and on August 30, 1972, a supply ship found that the Enewetak people had been out of rice, flour, sugar and canned meat for over 2 weeks.

The nuclear program on Enewetak Atoll extended from April 1948 to August 1958, and included 43 atomic and hydrogen bomb tests. The program included Operation SANDSTONE (April and May 1948), Operation GREENHOUSE (April and May 1951), Operation IVY (November 1952), Operation REDWING (May through July 1956), and Operation HARDTACK (May through August 1958). The nuclear tests at Enewetak Atoll included detonations in the air, on towers, on the surface of islands and reefs, on barges, and underwater. Two plutonium tests on the island of Runit, as a result of failure to fully detonate, sprayed chunks of plutonium across the island. On August 22, 1958, the President announced a suspension of further atmospheric testing of nuclear weapons to take effect October 31, 1958.

The nuclear testing program resulted in serious damage to Enewetak Atoll. Five islands were completely or partially vaporized. Islands on the northern half of the atoll, including Engebi and Runit, were heavily contaminated with radioactivity; radioactive wreckage littered many of the islands. The lagoon was seriously damaged. Vegetation was completely stripped from many islands, and nearly all plants of agricultural and economic value on the atoll were totally destroyed.

On November 5, 1956, the two hereditary chiefs, and a majority of the Enewetak people who possessed rights in the atoll were assembled on Ujelang to discuss a settlement of past and future use of the atoll. On November 19, 1956, the High Commissioner of the TTG as one party and the two hereditary chiefs, 24 individuals of Enewetak and 24 individuals of Engebi, as the other parties, executed a document captioned: "Agreement in Principle Regarding the Use of Enewetak Atoll." This document provided that the TTG would grant and convey to the Enewetak people full use rights in Ujeland atoll to continue "until such time as it may be possible for the people to return to Enewetak." The TTG was given full use rights to Enewetak Atoll "until such time as it will not be necessary to occupy and use Enewetak Atoll in the interest of the maintenance of international peace and security." The sum of $175,000 was to be conveyed to persons who possess

rights in Enewetak, to be administered as follows: $25,000 paid at the time of signing to be divided by the hereditary chiefs, and the remaining $150,000 to be placed in a trust fund administered by the High Commissioner. Section 5 of the document contained an assertion that the chiefs and alabs who signed had the "full and complete" right to represent the Enewetak people and included the following provisions with respect to claims for use of the atoll:

Accordingly, the Chiefs and "Alabs" signing this agreement agree that any future claims based on the use of Enewetak by the Governments of the United States or the Trust Territory or on the moving of the people from Enewetak Atoll to Ujeland Atoll shall be against them and not against the Government.

This agreement was made voluntarily and without any compulsion or coercion whatsoever.

On June 20, 1957, a document captioned "Use and Occupancy Agreement for Land in the Trust Territory of the Pacific Islands under the Administrative Responsibility of the Department of the Interior" was recorded in Record Book No. 1 of the Marshall Islands District. This document recites it was made as of the 2nd day of March 1944 by and between the TTG, as grantor, and the United States of America, and that the TTG was "owner of exclusive use and occupancy rights for an indefinite period of time" of the Enewetak Atoll, and that the United States "desires to acquire the use and occupancy of the land" for an indefinite period of time. In the agreement, TTG conveyed to the United States the exclusive right to use and occupy Enewetak Atoll for an indefinite period of time, and agreed to save the United States harmless from any and all claims, arising directly or indirectly from such use or occupancy, except for claims arising from negligence by the United States. The section on conditions of use, provided: (1) that use by the United States shall be consistent with the provisions and purposes of the Trusteeship Agreement; (2) that on or about June 30, 1961, and on a similar date each 5-year period thereafter, the United States and the TTG would "jointly review and determine the need for continuing the use and occupancy", with final decision in the President of the United States; and (3) that if a decision was made that a need for continued use and occupancy does not exist, the grant would terminate and "all interest in said land shall revert to" the TTG.

During the 1960's, after the prohibition of atmospheric and underwater testing, Enewetak Atoll's lagoon was used as a target for test missiles fired from Vandenberg Air Force Base in California.

In September 1971, the United States Defense Nuclear Agency and the Air Force developed plans for an operation on Enewetak Atoll to be known as the Pacific Cratering Experiments (PACE). The program was designed to test cratering effects of nuclear blasts by simulating such blasts with high explosives. Between September 1971 and October 1973, the United States preparations for PACE included stripping vegetation and topsoils from one of the islands. In October 1972, the United States District Court for the District of Hawaii granted a preliminary injunction to the people of Enewetak to prohibit further work on PACE until adequate environmental impact studies were conducted. *People of Enewetak v. Laird*, 353 F.Supp. 811 (D.Hawaii 1973). On June 8, 1973, the Air Force terminated plans for the PACE program on Enewetak.

On April 18, 1972, the United States Special Representative to the Micronesian Political Status Talks announced that the United States would return Enewetak Atoll to the people of Enewetak by the end of 1973. From 1972 until 1977, various United States government agencies engaged in studies and planning for radiological cleanup and rehabilitation programs.

On August 31, 1976, representatives of the United States executed a document captioned "Agreement Terminating Rights, Title, and Interest of the United States to Enewetak Atoll." This document, after a recital that the United States wishes to terminate its use and occupancy in Enewe-

tak Atoll, provides that all rights, title and interest of the United States in or to Enewetak Atoll "existing at noon on the day prior to the date of signature by the last party to sign this agreement are hereby terminated." The Acting High Commissioner of the TTG, the last party to sign, executed the document on September 16, 1976.

On September 16, 1976, the TTG Acting High Commissioner executed a document captioned "Release and Return of Use and Occupancy Rights to Enewetak Atoll." This document provides that the TTG does hereby "quitclaim, release and restore to all persons who hold traditional rights to the lands of Enewetak Atoll all right, title, interests and rights of use and occupancy in and to Enewetak Atoll."

From May 1977 through April 1980, the United States undertook cleanup efforts. In April 1980, the Enewetak people as a whole returned to Enewetak Atoll for permanent residence.

The Enewetak people have been able to resettle only the southern portion of the atoll. Access to several of the northern islands, including Engebi, is restricted by order of the Department of the Interior on the ground that remaining radioactivity renders these islands dangerous for habitation, agriculture, and many other uses for a period estimated to be approximately 30 years. Runit Island presently contains more than 110,000 cubic yards of plutonium-contaminated soil and debris that during the cleanup operation had been collected from throughout the atoll. This material had been mixed with cement and water to form a slurry, placed in a bomb crater on Runit, and covered by a concrete dome 18 inches thick and 370 feet in diameter. Runit is expected to be extremely radioactive for at least the next 240,000 years. Damage to the lagoon has not been repaired and plants that were replaced during the cleanup have not yet matured. They will not yield foods in substantial amounts for at least 8–10 years.

The complaint in the *Peter* case lists four causes of action: (1) unlawful taking of the atoll between December 1947 and April 1980; (2) breach of an implied-in-fact contract that imposed upon the United States responsibilities toward the Enewetak people in the nature of a fiduciary; (3) failure to comply with the terms of the Trusteeship Agreement, allegedly a bilateral contract between the United States and the Security Council of the United Nations; and (4) breach of agreements between the United States and the TTG contained in the September 16, 1976, "Agreement Terminating Rights, Title, and Interest of the United States to Enewetak Atoll" as implemented by the "Release and Return of Use and Occupancy Rights to Enewetak Atoll" signed on September 16, 1976, by the TTG.

Defendant's motion to dismiss is based upon three grounds: (1) plaintiffs' claims in counts I, II, and III are barred by the statute of limitations; (2) the United States has not waived its sovereign immunity as to the nontaking claims in counts II and III; and (3) plaintiffs have failed to state a claim in counts I, II, III and IV upon which relief may be granted.

*Statute of Limitations*

Any claim that is not filed within 6 years after such claim "first accrues" is time-barred. 28 U.S.C. § 2501 (1982). Accordingly, this court does not have jurisdiction with respect to any claim that accrued prior to September 15, 1976, in the *Peter* case, which was filed September 15, 1982.

Count I of the amended complaint asserts that defendant's actions between December 1947, when the people were compelled to move, and which continued until April 1980, when cleanup operations were completed, constitute a total or partial taking of the land and lagoon of Enewetak Atoll for which the Fifth Amendment requires payment of just compensation. Results of this taking include: (1) total deprivation of use and occupancy of the atoll between December 1947 and April 1980; (2) five islands were totally or partially vaporized by the nuclear tests; (3) Runit is permanently unuseable because of radioactive contamination; (4) Engebi and other northern islands will not be inhabitable for the

next 30 years because of radiation hazards; and (5) permanent damage to the lagoon and temporary damage to the ability of the atoll to sustain food production.

Plaintiffs see the United States actions as a temporary taking whose character, duration, and extent could not be ascertained until April 1980 when the Enewetak people were permitted to return to the atoll. Plaintiffs cite the scope or duration cases as controlling precedent under the facts for its contention that the statute of limitations did not begin to run until the full extent or duration of the taking became clear. *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) and its application in *Castro v. United States*, 205 Ct.Cl. 534, 500 F.2d 436 (1974).

Defendant argues that any taking in a constitutional sense occurred, if at all, either in December 1947 when the removal substantially disturbed the people's use and enjoyment of the atoll, or on June 20, 1957, with the execution of the Use and Occupancy Agreement. That agreement, with the TTG, gave the United States the right to use the atoll indefinitely, subject only to the United States right to make, unilaterally, a decision to terminate the agreement. Defendant views *Kabua, Kabua v. United States*, 212 Ct.Cl. 160, 546 F.2d 381 (1976) as comparable on the facts and to be controlling on any question of timeliness of plaintiffs' taking claim.

In consideration of a motion to dismiss, facts alleged in the complaint are taken as true and are construed in a light favorable to plaintiff. There is no dispute on plaintiffs' assertion that defendant's actions have resulted in such interference with plaintiffs' right that their property has been "taken" as that concept has been delineated in litigated cases. Whether the taking is compensable, in an action in this court, however, requires more than a showing of a taking in fact. To be compensable, the claim must be filed within 6 years of the time plaintiffs' right to claim against the United States first accrued.

■ A claim for just compensation in a taking by inverse condemnation is uniquely fact intensive. Denial of a taking claim on the basis of the defense of limitations is warranted only where the facts alleged demonstrate conclusively that such decision is required as a matter of law. Insofar as the bar of limitations is concerned, under the facts of a particular case, the issue is not when the land owner *could* have sued, the issue is when he *must* sue. *United States v. Dickinson*, 331 U.S. at 749, 67 S.Ct. at 1385. The question to be decided, on defendant's motion to dismiss, is the time the statute of limitations must commence to run because the fact of a taking by the United States no longer can be in controversy.

In *Dickinson*, the Supreme Court stated that property is taken in a constitutional sense "when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in a course of time." 331 U.S. at 748, 67 S.Ct. at 1385. Other cases define the period when limitations begin to run as the date the government's actions result in the physical invasion of plaintiff's property, or on the date the government's actions amount to a substantial interference with the owner's use and enjoyment of the property. *United States v. Clarke*, 445 U.S. 253, 258, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980); *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); *Eyherabide v. United States*, 345 F.2d 565 (Ct.Cl.1965).

■ Whether a taking is characterized as "temporary" or "permanent" is of little significance in a determination as to whether a taking in fact has occurred. It is not conclusive on the issue of when a suit must be brought on a taking claim; such characterization has bearing on the measure of damages. The fact that the United States eventually returns the use of property to the person from whom it has been taken does not alter the taking date. *United States v. Dickinson*, 331 U.S. at 749, 67 S.Ct. at 1385; *United States v. Dow*, 357

U.S. 17, 27, 78 S.Ct. 1039, 1047, 2 L.Ed.2d 1109 (1958); *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 888 (Fed.Cir.1983).

Plaintiffs contend that five of their islands, totally or in part, were vaporized. As to these islands, the taking hardly can be characterized as "temporary". After the nuclear explosions the islands ceased to exist, there no longer could be controversy that a taking in fact had occurred.

Defendant argues that the Use and Occupancy Agreement, executed on June 20, 1957, constituted a permanent taking as of the date of the agreement. By its terms, however, the agreement was effective as of March 2, 1944. If the date the Use and Occupancy Agreement supposedly became effective is considered to be the taking date, the "taking" would have occurred during the war and would not be compensable. *United States v. Caltex, Inc.*, 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952); *Juraqua Iron Co. v. United States*, 212 U.S. 297, 29 S.Ct. 385, 53 L.Ed. 520 (1909). Moreover, the statute of limitations would have run by 1950, 7 years before the agreement was signed. Whatever impact an agreement between the TTG and the United States ultimately may be found to have with respect to plaintiffs' nuclear testing claims, the execution of the Use and Occupancy Agreement, and the agreement itself, does not establish a taking date for limitations purposes.

The facts relative to the nuclear testing program on Enewetak Atoll make it reasonable to apply the doctrine of the scope and duration cases developed in *Dickinson* and its progeny. The testing program consisted of an intermittent sequence of events over an extended time period, and was of uncertain duration until termination by Presidential order in 1958. For purposes of application of the bar of limitations, plaintiffs should not be required to file a suit at the beginning of such a continuing process of physical events. Plaintiffs were entitled to wait until the fact of the taking was not in controversy and the consequences were manifest so that a final account could be struck.

When all testing ceased in 1958, there no longer could be controversy about a taking. By that date, the consequences were manifest and the harm to plaintiffs' property had occurred.

The situation at Enewetak differs factually from the situation at Bikini. The Bikinians were assured in 1968 that the atoll was safe for resettlement, were permitted to return, and then in August 1978 again were removed because of unforeseen radiation dangers. At Enewetak, after the termination of nuclear tests, there was no new relocation of the people after resettlement had been permitted. The people of Enewetak in 1980 were permitted to return only to those areas of the atoll which were within tolerable limits of radiation exposure.

■ By 1958, when all testing ceased, the fact of a taking no longer could be in controversy. There was no further invasion, destruction, or contamination of the property by the United States after that date. For purposes of application of the statute of limitations, in a claim for just compensation for a taking, August 22, 1958, must be the "taking date" of Enewetak Atoll, in accordance with the doctrine announced in *Dickinson*.

After 1958, the United States continued to use the atoll in a manner that is compatible with use of its own property. In the 1960's Enewetak served as the target in United States programs to develop ballistic missiles. Between September 1971 and October 1973, the United States prepared some islands for further use in the PACE program. These continuing actions support the conclusion that plaintiffs' property interest, by that time, had been appropriated by the United States.

Accordingly, defendant is entitled to prevail on its motion to dismiss with respect to the taking claims alleged in count I of the complaint.

■ In its initial motion, defendant also contended the statute of limitations barred any relief for plaintiffs' claims, insofar as such claims accrued before September 15,

1976, in count II for breach of an implied-in-fact contract and in count III based on breach of the Trusteeship Agreement. In its reply brief, defendant enlarged its limitations argument to include all nontaking claims asserted by plaintiffs. Defendant's argument in this regard concentrates upon the problems and general rules involved in application of limitations to a continuing or repudiated fiduciary relationship; defendant does not address the thrust of plaintiffs' nontaking claims as it bears upon an analysis of the bar of limitations.

In count II, the complaint alleges that defendant has breached and continues to breach an implied-in-fact contract between the United States and the Enewetak people by its failure to supply food, shelter, and supplies during the residence on Ujelang, which ended in April 1980, and by its failure to return Enewetak Atoll in its original condition or to compensate them for damages to the atoll. In count III, plaintiffs contend that the Trusteeship Agreement is an express bilateral contract between the United States and the United Nations Security Council under which plaintiffs are intended third party beneficiaries. Obligations owed by the United States to plaintiffs allegedly have been breached by deprivations caused by the United States during the exile to Ujelang, by damages to the atoll, and by failure to return part of the atoll. In count IV, plaintiffs seek damages as intended third party beneficiaries to an agreement between the TTG and the United States executed September 16, 1976, for breaches that thereafter occurred.

Each of these counts allege transactions between the parties that occurred after September 15, 1976. As to those transactions, defendant acknowledges that dismissal on the basis of the bar of limitations is not appropriate. Defendant, also, advances other grounds which it asserts warrant dismissal of the complaint at this stage of the proceedings. Whatever the validity of these other arguments, it is clear that plaintiffs are not barred by the statute of limitations from an offer of proof as to the origin, nature, and content of the alleged implied-in-fact contract, and,

as to the intent of the parties specifically to benefit and confer a cause of action on plaintiffs in the other alleged express contracts.

*Sovereign Immunity*

The implied-in-fact contract alleged in count II of the complaint consists of mutual understandings that rest on two foundations: (1) a course of dealing beginning in 1944 between the United States officials that administered Enewetak Atoll and the Enewetak people, and (2) the circumstances in the removal of the people from the atoll. The alleged terms of the implied-in-fact contract include the assumption by the United States of obligations and responsibilities as a fiduciary. Such obligations of the United States are said to include a duty to: (1) insure the physical, economic, and social well being of the Enewetak people while on Ujelang, which was known to be inadequate for a regular supply of food and other necessities; (2) provide food, shelter and other necessities to supplement resources available on Ujelang; and (3) return the people to Enewetak Atoll, at the conclusion of United States need, with compensation for damage to the atoll.

Defendant's motion to dismiss contends this court lacks jurisdiction with respect to the implied-in-fact contract because: (1) no consent for suit has been given for acts of the United States representatives which are sovereign acts inextricably connected to defense and foreign policy goals; (2) the implied-in-fact contract is not founded on any provision of the Constitution, statute or regulation that mandates compensation; (3) the claims sound in tort; and (4) breach of the implied-in-fact contract effectively is a claim for breach of fiduciary duties, which to be cognizable in court must be founded on a statute, Indian treaty, an Executive order or regulation.

■ This court's Tucker Act jurisdiction includes contracts which are implied-in-fact. 28 U.S.C. § 1491(a)(1) (1982). *Russell Corp. v. United States*, 210 Ct.Cl. 596, 537 F.2d 474 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). Al-

though a contract implied-in-fact is based on conduct, it requires a showing of the same contractual elements as that required to establish an express contract. The requirements of mutuality of intent and lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs. *Fincke v. United States,* 230 Ct.Cl. 233, 675 F.2d 289, 295 (1982); *Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 428 F.2d 1241, 1255 (1970). The representatives of the United States whose conduct is relied upon must have actual authority to bind the government in contract. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Jascourt v. United States,* 207 Ct.Cl. 955, 521 F.2d 1406, *cert. denied,* 423 U.S. 1032, 96 S.Ct. 562, 46 L.Ed.2d 405 (1975).

In 28 U.S.C. § 1491(a)(1), Congress has waived the sovereign immunity of the United States for the classes of claims there defined. Defendant's arguments that specific authority that mandates monetary compensation or creates a fiduciary obligation is required to establish a waiver of sovereign immunity do not take into account the distinction between claims based upon breach of an authorized contract and claims founded upon the Constitution, a statute or regulation. The Claims Court is authorized in 28 U.S.C. § 1491(a)(1) to render judgment upon any claim that is founded on the Constitution, *or* on any statute or regulation of an executive department, *or* is founded upon any express or implied contract. Where the claim is based upon the Constitution, a statute or regulation, the court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal government for damages sustained. *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (Mitchell II). Where a contract, express or implied, has been made by federal officials who Congress has authorized to so act on behalf of the United States, however, the court is not required to make further inquiry to determine whether a separate source of substantive law mandates compensation. Where such a valid contract has been made, a claim founded upon its breach is cognizable under the provisions of 28 U.S.C. § 1491(a)(1). The law of contracts mandates the compensation the United States is obligated to pay for a breach.

Defendant's assertion that sovereign immunity requires plaintiffs to point to a statute or regulation that mandates compensation in order to recover for breach of an implied-in-fact contract is not supported by precedent. The cases relied upon by defendant, *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002 (1967) involve claims that were not based on contracts. Those cases stand for the principle that specific statutory authority is required for recovery of money damages under the Tucker Act when the claim involved is noncontractual.

Where a contract establishes a fiduciary relationship, the absence of a separate statutory basis that would mandate compensation for breach of fiduciary obligations does not deprive the court of jurisdiction over the breach claim. In 28 U.S.C. § 1491(a)(1), Congress has waived sovereign immunity with respect to a breach of "any" implied contract with the United States. The Court of Claims acknowledged jurisdiction when a breach of fiduciary duties based on an implied contract was alleged. *Fields v. United States,* 191 Ct.Cl. 191, 423 F.2d 380, 383 (1970).

In support of its contention that the United States in its dealings with the Enewetak people acted as a sovereign, defendant cites *Horowitz v. United States,* 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925); *Air Terminal Serv., Inc. v. United States,* 165 Ct.Cl. 525, 330 F.2d 974, *cert. denied,* 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 38 (1964); *Sommerville Tech. Serv. v. United States,* 226 Ct.Cl. 291, 640 F.2d 1276 (1981); and *Aetna Cas. & Sur. Co. v. United States,* 228 Cl.Ct. 146, 655 F.2d 1047 (1981).

Whether particular acts of the United States are done in a sovereign capacity or in a proprietary capacity turns on the nature of the government's action and the relationship of the parties involved. Where the United States in furtherance of general public objectives enters contracts with local public agencies to provide loans or grant funds, as in *Sommerville* and *Aetna*, the loan or grant program is undertaken in its sovereign capacity, and no express or implied contract results with those third parties who deal with the local public agency. In situations where the government is in privity of contract with a claimant, as in *Air Terminal*, no liability arises for government acts taken for benefit of the general public, even though an express contract is directly affected. The sovereign act defense has no application when the challenged government actions do not have public and general applicability, or when the actions were focused principally and primarily on the direct relationship with the injured claimant. *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786 (1978); *Ottinger v. United States*, 116 Ct.Cl. 282, 88 F.Supp. 881 (1950).

■ In this case authorized officials of the United States dealt directly with the Enewetak people in a program to test atomic devices. The decisions to conduct an atomic testing program and to remove the Enewetak people from their atoll clearly were related to and involved in defense and foreign affairs functions of the United States. Such relationship, however, does not convert all actions taken to implement the program into "sovereign acts" that withdraws the Tucker Act's consent to suit for implied-in-fact contracts. In the normal course, conduct of foreign affairs and pursuit of defense policies routinely is accompanied and implemented by numerous contracts made by the United States. Such supplemental and implementing contracts are entered in a proprietary capacity and are cognizable in court. The policy considerations that motivate the sovereign to adopt the overall program do not create an umbrella that shields the Government from liability for breach of valid contracts customarily entered. A multitude of defense contractors would be surprised to be told that contracts for ship construction, aircraft production and munitions testing were unenforceable because they were related to defense and foreign policy goals. A sovereign acts exception to the Tucker Act that is as broad as defendant suggests would vitiate this court's contract jurisdiction.

Defendant's contention that this court lacks jurisdiction because the implied-in-fact contract claim actually sounds in tort is discussed below.

On the basis of the foregoing, defendant's contention, that this court lacks jurisdiction because sovereign immunity has not been waived, lacks validity. Accordingly, defendant's motion to dismiss the claims in count II on this basis must fail.

■ Claims in count III of the complaint are based upon an alleged failure of the United States to comply with obligations assumed in the Trusteeship Agreement, which is seen by plaintiffs as a bilateral contract between the United States and the Security Council of the United Nations.

Congress has declared that the United States Claims Court shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations. 28 U.S.C. § 1502 (1982). The Court of Claims noted that the Trusteeship Agreement does not add anything to the court's jurisdiction, and recognized it as a treaty under 28 U.S.C. § 1502. *Kabua, Kabua v. United States*, 546 F.2d at 385.

The rationale for 28 U.S.C. § 1502 lies in the desire to avoid judicial interference with the conduct of foreign relations by the Executive Branch. *Hughes Aircraft Co. v. United States*, 209 Ct.Cl. 446, 534 F.2d 889, 903, n. 17 (1976). The United Nations is a group that includes foreign nations. Plaintiffs characterize it as an international organization with its own legal personality and argue that, the United States' relationship with the United Nations is fundamentally different from its relationship with

foreign nations. This difference, plaintiffs contend, is such that an agreement with the Security Council is not an agreement with foreign nations. Plaintiffs continue that there is little danger that adjudication of claims arising out of the Trusteeship Agreement will interfere with foreign affairs. Plaintiffs' arguments are not persuasive insofar as this court's jurisdiction is concerned.

The Trusteeship Agreement is a treaty, and it has been made with a recognized unit of foreign nations. Plaintiffs' claim in count III clearly grows out of and is dependent upon that treaty. Plaintiffs' claims in count II have no existence that is separate and apart from the Trusteeship Agreement. Such relationship bars jurisdiction in this court. *Hughes Aircraft Co. v. United States*, 534 F.2d at 903; *S.N.T. Fratelli Gondrand v. United States*, 166 Ct.Cl. 473, 478 (1964).

Accordingly, with respect to the claims alleged in count III of the complaint, defendant is entitled to prevail on its motion to dismiss.

*Failure to State a Claim*

Defendant contends that plaintiffs in count II have not pleaded the requisite elements of an implied-in-fact contract. The moving of plaintiffs from the atoll to avoid the danger from nuclear testing allegedly is not sufficient consideration to support an implied-in-fact contract that is cognizable in this court. Defendant defines consideration for an implied-in-fact contract with the United States as either, (1) the performance of services with the reasonable expectation of payment, or (2) payment of money which the party wants returned. Defendant further points out that Congress has recognized moral obligations to the Marshallese. The repeated passage of statutes that make ex gratia payments to plaintiffs, defendant says, makes it plain there is no meeting of the minds and that no contract was intended to be entered.

■ In count II, plaintiffs have alleged facts which for purposes of a motion to dismiss must be accepted as true. The facts, as alleged, establish conduct that is adequate to establish the requisite elements of a contract implied-in-fact. The complaint alleges actions over an extended period by responsible government officials authorized to act that fairly can be construed to show that the United States promised to care for the physical and economic needs of the Enewetak people while it conducted atomic tests and to return the atoll when the need was over. In return for promises made by defendant, the complaint alleges that the people of Enewetak complied with the decisions and orders of the United States, abandoned their homeland and accepted temporary relocation to Ujelang Atoll without any attempt to resist, either physically or by means of petitions to the United States or to international forums.

The conduct as alleged, if shown, could support a contract implied-in-fact. The allegations clearly are not frivolous. Whether plaintiffs' evidence ultimately will be sufficient to establish the facts alleged in the complaint is not before the court on a motion to dismiss.

Defendant argues that the court lacks jurisdiction of the claims in count II, and that count II fails to state a claim, because the claims actually sound in tort. Defendant contends that the claims in count II, although couched in breach of contract language, involve abuse or misuse of discretion, discretionary policy judgments, deceit, negligence, or other acts that in substance and reality are tortious in nature.

■ Claims that in fact sound in tort, even if couched in the language of an implied-in-fact contract, are beyond the scope of 28 U.S.C. § 1491(a)(1). *Aetna Cas. & Sur. Co. v. United States*, 655 F.2d at 1059; *Somali Dev. Bank v. United States*, 205 Ct.Cl. 741, 508 F.2d 817, 820 (1974). In this case, plaintiff alleges a breach of contract; it is not fatal that the actions alleged could constitute both a tort and a breach of contract. The Claims Court has jurisdiction to consider a claim for breach of an implied-in-fact contract notwithstanding the

possible existence of a tort remedy. "An act may sometimes be such as to constitute a tort as well as a breach of contract and thus afford an injured party an election between actions." *Hatzlachh Supply Co. v. United States*, 444 U.S. 460, 100 S.Ct. 647, 62 L.Ed.2d 614 (1980); *Barrow Dev. Co. v. Fulton Ins. Co.*, 418 F.2d 316, 319 (9th Cir.1969). Where an enforceable contract is alleged, an action for breach is not beyond the scope of the Tucker Act simply because elements of tort are present. *Fountain v. United States*, 192 Ct.Cl. 495, 427 F.2d 759, 761 (1970), *cert. denied sub nom. Fountain v. Redevelopment Land Agency*, 404 U.S. 839, 92 S.Ct. 131, 30 L.Ed.2d 73 (1971); *Burtt v. United States*, 176 Ct.Cl. 310 (1966).

Defendant also contends that count II fails to state a claim because the Trusteeship Agreement is an express contract and there cannot be an implied contract where there is an express contract that covers the same subject matter. The fact that one count of the complaint asserts claims arising from the Trusteeship Agreement does not bar plaintiffs from pursuing their claims under an implied-in-fact contract.

■ As a general rule, the existence of an express contract between the parties would preclude the existence of an implied contract between them dealing with the same subject. Any implied contract, to be valid, must be unrelated to the express contract. *ITF Fed. Support Serv., Inc. v. United States*, 209 Ct.Cl. 157, 531 F.2d 522, 528 (1976); *Algonac Mfg. Co. v. United States*, 428 F.2d at 1255.

■ Plaintiffs' implied contract, and the fiduciary obligations alleged to have been assumed, are readily distinguishable from the obligations defendant undertook in the Trusteeship Agreement with respect to the inhabitants of the occupied territory. The parties to the agreements are not the same. The Trusteeship Agreement is between the United States and the United Nations Security Council; the parties to the alleged implied contract are the United States and the people of Enewetak. The rule that the existence of an express contract preempts

an implied contract has full effect only when the parties to both contracts are the same. 17 C.J.S. *Contracts* § 5 (1963).

■ Plaintiffs allege the implied-in-fact contract was created after defendant approved the Trusteeship Agreement in July 1947, and includes subsequent conduct of the parties that is not covered by the express contract. The Trusteeship Agreement, by its terms, does not preclude claims based on an implied contract between the United States and peoples in the Trust Territory.

Count IV of the complaint alleges plaintiffs are third party beneficiaries to the overall transaction involved in the September 16, 1976, agreement between the TTG and the United States that terminated United States rights to Enewetak Atoll, and the September 16, 1976, release by the TTG that returned use and occupancy rights to the Enewetak people. The facts do not support plaintiffs' contention. They are not sufficient to state a claim for plaintiffs as intended third party beneficiaries.

The Court of Claims has established that in an appropriate case an intended third party beneficiary of a Government contract may maintain an action under 28 U.S.C. § 1491. *Hebah v. United States*, 192 Ct.Cl. 785, 428 F.2d 1334, 1340 (1970); *Deltec Corp. v. United States*, 164 Ct.Cl. 432, 326 F.2d 1004 (1964); *see also Bogart v. United States*, 209 Ct.Cl. 208, 531 F.2d 988 (1976). An individual who is not a party to a contract, however, does not have a right to sue for breach of that contract merely because he would benefit from its performance or because it would be beneficial for him to have such right. *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230, 33 S.Ct. 32, 33, 57 L.Ed. 195 (1912); *Orchards v. United States*, 4 Cl.Ct. 601, 609 (1984); *Ables v. United States*, 2 Cl.Ct. 494, 500 (1983), *aff'd*, 732 F.2d 166 (Fed.Cir.1984).

Neither the agreement between the TTG and the United States, nor the release executed by the TTG, names the plaintiffs as third party beneficiaries. The simulta-

neous execution of the release and return agreement by the TTG is not adequate to establish that plaintiffs were intended third party beneficiaries to the agreement between the United States and the TTG that terminated United States rights. The United States was not a party to the release and the terms of the United States agreement with the TTG were not incorporated by reference in the release.

On these facts, the September 16, 1976, transactions did not confer rights as third party beneficiaries to plaintiffs. Accordingly, with respect to the claims alleged in count IV of the complaint, defendant is entitled to prevail on its motion to dismiss.

## CONCLUSION

On the basis of the foregoing, defendant's motion to dismiss is allowed with respect to plaintiffs' claims in counts I, III and IV of the complaint and is denied with respect to the claims in count II. Defendant will file its answer to count II of the complaint 30 days from this date.