**UNITED STATES of America**

v.

**John Phillip Walker LINDH**

No. CR. 02–37–A.

United States District Court, E.D. Virginia, Alexandria Division.

Oct. 4, 2002.

Randy Bellows, U.S. Atty's Office, Alexandria, VA, for Plaintiff.

William Bruce Cummings, David Thomas Williams, Alexandria, P.C., James Brosnahan, George C. Harris, Tony West, Somnath Raj, Chatterjee, San Francisco, CA, for Defendants.

## SENTENCING MEMORANDUM

ELLIS, District Judge.

On July 15, 2002, defendant John Phillip Walker Lindh pled guilty, pursuant to a written Plea Agreement,[1] to Count Nine of a ten-count Indictment charging him with supplying services to the Taliban, in violation of 50 U.S.C. § 1705(b), 18 U.S.C. § 2 and 31 C.F.R. §§ 545.204 and 545.206(a), and to a one-count criminal Information charging him with carrying an explosive during the commission of a felony which may be prosecuted in the United States, in violation of 18 U.S.C. § 844(h)(2).[2] He is now before the Court for sentencing.

---

1. A copy of the July 15, 2002 Plea Agreement is attached to, and made a part of, this Sentencing Memorandum.

2. The remaining nine counts of the ten-count Indictment were dismissed on the government's motion at the time of sentencing. *See United States v. Lindh,* Criminal No. 02–37–A (E.D.Va. Oct. 4, 2002) (Order). These dismissed counts charged defendant with the following additional offenses:

   (i) conspiracy to murder nationals of the United States, including American military personnel and other governmental employees serving in Afghanistan following the September 11, 2001 terrorist attacks, in violation of 18 U.S.C. § 2332(b)(2) (Count One);

   (ii) conspiracy to provide material support and resources to Harakat ul-Mujahideen (HUM), a foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Count Two);

   (iii) providing material support and resources to HUM, in violation of 18 U.S.C. § 2339B and 2 (Count Three);

   (iv) conspiracy to provide material support and resources to al Qaeda, a foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Count Four);

## A. *Offense Conduct:*

The record reflects that in approximately May 2001, defendant, an American citizen, traveled to Pakistan for the purpose of attending a military training camp operated and funded by Harakat ul-Mujahideen (HUM).[3] To this end, defendant spent three days at a HUM recruiting center in Peshawar and then traveled by bus to Mansehra, located north of Islamabad along the Azad Kashmir border. Before leaving the recruiting center, defendant was told by HUM officials not to disclose his American citizenship to anyone. Defendant arrived at the HUM military training camp, Madrassa Ismail Shaheed, in May 2001, and was promptly escorted by HUM officials to a building used to house foreigners and guests. Defendant's participation in the HUM training program began three days later and lasted approximately twenty days. According to defendant, the training program focused primarily on the goals of Jihad, physical exercise and weapons training, including firing approximately 20 to 30 rounds using various types of weapons.

Following this training, defendant returned to the HUM recruiting office in Peshawar and told officials there that he wished to fight with the Taliban on the front line in Afghanistan. Thereafter, in late May or June 2001, defendant traveled from Pakistan into Afghanistan for the purpose of taking up arms with the Taliban against the Northern Alliance. He eventually arrived at a Taliban recruiting center in Kabul—the Dar ul-Anan Headquarters of the Mujahideen—and on his arrival, he advised Taliban personnel that he was an American citizen and that he wished to fight on the front line against the Northern Alliance. He was advised by Taliban officials that before this could occur, he would be required to undergo additional training with "the Arab group," since he spoke only Arabic. Thus, while at the Dar ul-Anan Headquarters, defendant agreed to attend a training camp in Afghanistan for additional, more extensive military training. Accordingly, in approximately June 2001, defendant traveled to a guest house in Kandahar, where he remained for approximately three to four days. From there, he traveled with approximately 20 other trainees (most of whom were Saudis) to the al Farooq training camp located several hours west of Kandahar, a facility associated with and funded by Usama bin Laden and al Qaeda.

Defendant remained at the al Farooq camp throughout June and July 2001, participating fully in the camp's training activities, including weapons and explosives training, orienteering, navigation, and battlefield combat. Bin Laden visited the al Farooq training camp on approximately three occasions during defendant's training

> (v) providing material support and resources to al Qaeda, in violation of 18 U.S.C. § 2339B and 2 (Count Five);
> (vi) conspiracy to contribute services to al Qaeda, in violation of 31 C.F.R. §§ 595.205 and 595.204 and 50 U.S.C. § 1705(b) (Count Six);
> (vii) contributing services to al Qaeda, in violation of 31 C.F.R. §§ 595.204 and 595.205 and 50 U.S.C. § 1705(b) and 18 U.S.C. § 2 (Count Seven);
> (viii) conspiracy to supply services to the Taliban, in violation of 31 C.F.R.
>
> §§ 545.206(b) and 545.204 and 50 U.S.C. § 1705(b) (Count Eight); and
> (ix) using and carrying firearms and destructive devices during crimes of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(B)(ii) and 2 (Count Ten).

**3.** On October 8, 1997, HUM was designated by the Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act. *See* 62 Fed. Reg. 52650 (1997).

period. During these visits, bin Laden lectured defendant and other trainees on various topics, including the local political situation. During one visit, in particular, defendant, along with four other trainees, met and spoke personally with bin Laden for approximately five minutes. Prior to this meeting with bin Laden, defendant voluntarily swore allegiance to Jihad. Defendant contends that bin Laden did not mention or refer to the United States in any way in any of his comments or conversations.

When defendant completed his training at al Farooq in July or August 2001, he was asked by a camp administrator whether he was interested in taking part in operations against the United States, Israel or Europe. Defendant declined this offer, advising the camp administrator that he was interested only in fighting with the Taliban against the Northern Alliance in Afghanistan. Shortly thereafter, defendant traveled with approximately 30 other individuals to Kabul, where he was issued an AKM rifle by the Taliban. Armed with this rifle, defendant, together with approximately 150 similarly armed non-Afghanis, traveled from Kabul to the front line in Takhar, located in Northeastern Afghanistan. Thereafter, between September and November 2001, defendant's group was divided into smaller groups of 25 that fought in shifts against Northern Alliance troops in the Takhar trenches, rotating off the front line every other week. During this period, defendant carried various Taliban issued weapons, including an AKM rifle and two grenades. Defendant contends he never fired a weapon while on the front line, an interesting and surprising comment on the level of combat activity at the front line during that period.

The September 11, 2001 terrorist attacks occurred shortly after defendant arrived at the front line in Afghanistan. De-

fendant states that in June 2001, prior to the September 11 terrorist attacks, he learned, while at the guest house in Kandahar, that 50 people had been deployed for suicide operations. He claims, however, that he did not hear any details at that time as to who deployed the individuals or where or when they were deployed. He further claims that he did not learn of the September 11 terrorist attacks on the United States until September 12, 2001, while on the front line. Specifically, he claims a fellow Taliban fighter heard a report regarding the attacks on the radio and thereafter told defendant that planes had been flown into several buildings in New York. Defendant contends that he strongly disagreed then and now with the September 11 terrorist attacks on the United States, but that he did not voice his opposition while on the front line because he feared for his safety given that others in his fighting group expressed approval of the attacks. Further, he claims he made no effort to leave the Taliban at that time because he believed he would have been killed had he abandoned the front line on September 12 or thereafter.

Defendant claims that he first learned in October 2001, again from individuals on the front line, that bin Laden had ordered the September 11, 2001 terrorist attacks. Defendant also claims to have heard in October 2001 that bin Laden had deployed 50 people to carry out 20 suicide terrorist operations in the United States and elsewhere. These terrorist operations were to occur in three "waves," the first being the September 11, 2001 attacks, the second to occur at the beginning of Ramadan and the third to occur early the following year. In this regard, defendant claims to have heard that the second operation would be of such magnitude that it "would make America forget about the first attack," and that the third operation would "finish America."

In November 2001, defendant and his fighting group retreated from Takhar to Kunduz, where they ultimately surrendered themselves and their weapons to Northern Alliance troops. On November 24, 2001, defendant and several hundred other captured Taliban fighters were transported to Mazar-e–Sharif, and then to the nearby Qala–i–Janghi (QIJ) prison compound. The following day, November 25, defendant was interviewed by two Americans—Agent Johnny Micheal Spann from the Central Intelligence Agency (CIA) and another government employee. Defendant declined to answer any of the questions put to him by Agent Spann.

Later that day, some of the Taliban detainees overpowered the guards at the QIJ compound and armed themselves. Agent Spann was shot and killed in the course of this uprising and defendant, who was located on the lawn of the QIJ compound at the time the uprising began, was shot in the upper thigh. Following his injury, defendant fell to the ground and remained there for approximately 14 hours before retreating with other detainees to a basement area of the QIJ compound. Defendant then remained in the basement for approximately one week, during which time Northern Alliance soldiers used a variety of tactics to force the Taliban prisoners out of the basement, including bombs, gas, RPGs, fire and cold water. During this period, defendant suffered additional shrapnel wounds to his back, shoulder, ankles and toes.

The uprising at QIJ was eventually suppressed on December 1, 2001, at which time defendant and the other surviving Taliban soldiers were taken into custody by Northern Alliance and American forces and transported to Sherberghan for medical treatment. Defendant contends he played no role in planning or carrying out the QIJ uprising, that he had no advance knowledge of the uprising and that he had no role in the death of Agent Spann. Consistent with this, the government has no information or evidence to indicate that defendant had any advance knowledge of the QIJ uprising or that defendant participated in any way in the death of Agent Spann. Indeed, in the course of his allocution, defendant reaffirmed his lack of involvement in the planning of the QIJ uprising or in the death of Agent Spann.

By fighting with and supplying services to the Taliban, defendant committed a felony violation of 50 U.S.C. § 1705(b), 18 U.S.C. § 2 and 31 C.F.R. §§ 545.204 and 545.206(a). As agreed to by the parties in the Plea Agreement, this felony offense involved, or was intended to promote, a federal crime of terrorism within the meaning of U.S.S.G. § 3A1.4, in that the Taliban's control of Afghanistan and the activities of those individuals fighting in support of the Taliban provided protection and sanctuary to al Qaeda, a designated foreign terrorist organization.[4] Addition-

4. On October 8, 1999, al Qaeda was designated by the Secretary of State as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act. See 64 Fed.Reg. 55112 (1999). Additionally, in July 1999, President William J. Clinton declared a national emergency to deal with the threat posed by the Taliban, specifically finding that the actions of the Taliban in Afghanistan in allowing territory there to be used as a safehaven and base of operations for Usama bin Laden and al Qaeda constituted an unusual and extraordinary threat to the national security and foreign policy of the United States. See 64 Fed.Reg. 36759 (1999). Thus, in Executive Order 13129, President Clinton prohibited "the making or receiving of any contribution of funds, goods, or services to or for the benefit of the Taliban." 64 Fed.Reg. 36759. Presidents Clinton and George W. Bush subsequently determined, in June 2000 and in June 2001, respectively, that the national emergency with respect to the Taliban would continue. See 65 Fed.Reg. 41549 (2000); 66 Fed.Reg. 35363 (2001).

ally, by carrying an explosive during the commission of a felony which may be prosecuted in the United States, defendant committed a felony violation of 18 U.S.C. § 844(h)(2).

#### B. *Contested Matters:*

The parties have no objections to the facts or Sentencing Guidelines calculations contained in the Presentence Investigation Report (PSIR).

#### C. *Uncontested Matters:*

In the absence of any objections by the parties to the PSIR, and because the PSIR's findings and conclusions coincide with the Court's independent findings and conclusions, the Court adopts the findings and conclusions of the PSIR as its findings and conclusions in this sentencing proceeding.

Additionally, there appearing good cause to do so, it is hereby ORDERED that the following documents be attached to, and made a part of, the PSIR:

1. Essay written by defendant entitled "Thoughts on the Legitimacy of Suicide Bombings," a copy of which is also attached to, and made a part of, this Sentencing Memorandum;

2. Letter from defendant, dated August 15, 2002;

3. Letter from Frank R. Lindh, dated August 19, 2002;

4. Letter from Marilyn Walker, with attachments, dated August 26, 2002;

5. Letter from Joan F. Magnelli, dated August 21, 2002;

6. Letter from Pamela McMurphy, dated August 15, 2002;

7. Letter from Thomas E.R. Maguire, dated August 21, 2002;

8. Letter from William M. and Linda J. Collins, undated;

9. Letter from Ebrahim Nana, dated August 15, 2002;

10. Handwritten letter from Kathleen M. Lindh, dated August 18, 2002;

11. Letter from Connell J. Maguire, dated August 8, 2002;

12. Letter from Peter Collins, undated;

13. Letter from Connell Lindh, dated August 29, 2002;

14. Letter from Jerene and James Donovan, dated August 20, 2002;

15. Letter from Miriam Bale, dated September 6, 2002; and

16. Letter from Connell Lindh, dated September 20, 2002.

#### D. *Motion for Departure:*

No departure motions were filed; nor will there be any motions for a reduction of the sentence imposed on defendant today based on his cooperation with the government. *See infra* n. 7.

#### E. *Conclusions:*

1. The parties agree that the appropriate guideline applicable to the one-count criminal Information is U.S.S.G. § 2K2.4, entitled "Use of Firearm, Armor–Piercing Ammunition, or Explosive During or in Relation to Certain Crimes." This guideline provides that for a conviction under 18 U.S.C. § 844(h), as here, the appropriate guideline sentence "is the term of imprisonment required by statute," which in this case is a consecutive sentence of ten years. *See* U.S.S.G. § 2K2.4(a)(1); 18 U.S.C. § 844(h)(2).

The parties also agree that the most analogous guideline applicable to Count Nine of the Indictment is U.S.S.G. § 2M5.2, entitled "Exportation of Arms, Munitions, or Military Equipment or Services Without Required Validated Export License." This guideline provides for a

base offense level of 26. Additionally, the parties agree that a twelve-level upward adjustment to this base offense level is appropriate pursuant to U.S.S.G. § 3A1.4, as the offense "is a felony that involved, or was intended to promote, a federal crime of terrorism." Thus, defendant's adjusted offense level is 38.

2. Notwithstanding the Probation Officer's conclusion that defendant deserved credit for acceptance of responsibility, the Court, *sua sponte*, reviewed this matter *de novo* to assess whether a reduction in defendant's offense level was appropriate pursuant to U.S.S.G. § 3E1.1.[5] Central to this assessment was defendant's allocution at sentencing, wherein he convincingly and movingly declared his opposition to terrorism and his conviction that he would not have joined the Taliban had he been fully informed about that regime. Specifically, defendant stated that he accepted "full responsibility for violating U.S. sanctions" relating to the Taliban and expressed "remorse for what has happened." With respect to terrorism he stated "I condemn terrorism on every level, unequivocally." He also emphasized that:

> Bin Laden's terrorist attacks are completely against Islam, completely contrary to the conventions of jihad, and without any justification whatsoever.

> \*   \*   \*   \*   \*   \*

Terrorism is never justified, and has proved extremely damaging to Muslims around the world.[6]

> \*   \*   \*   \*   \*   \*

> I have never supported terrorism in any form, and never would.

Finally, defendant made clear his regret and remorse by stating that:

> I made a mistake by joining the Taliban. I want the Court to know, and I want the American people to know, that had I realized then what I know now about the Taliban, I would have never have [sic] joined them.

■ In the circumstances, and given defendant's allocution at sentencing, a three-level reduction is indeed appropriate under U.S.S.G. § 3E1.1. Accordingly, defendant's resulting total offense level is 35.

3. Although defendant has no prior criminal record, he is appropriately classified in Criminal History Category VI, rather than I, pursuant to U.S.S.G. § 3A1.4 (providing that "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism...the defendant's criminal history category...shall be Category VI").

■ 4. Although the range of punishment under the Guidelines is 292 to 365 months, a sentence within the Guidelines range cannot be imposed because there is a statutory maximum term of imprison-

---

5. *See, e.g., United States v. Pauley*, 289 F.3d 254, 261 (4th Cir.2002) (recognizing that "merely pleading guilty is not sufficient to satisfy the criteria for a downward adjustment for acceptance of responsibility," and that "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility").

6. Pertinent on this point is a brief essay defendant prepared which is attached to the PSIR, as well as to this Sentencing Memoran-

dum. There, he makes unmistakably clear that, in his view, suicide bombings that kill civilians are illegitimate under Islamic law and rejected by Muslim scholars throughout Islamic history. With sound logic, defendant correctly points out that martyrdom, the incentive for suicide terrorists, cannot be achieved by suicide, which is itself condemned in the Koran. In defendant's view, "a person cannot martyr himself;" martyrdom is achieved only when God chooses to confer it.

ment of ten years as to each count, to run consecutively to one another. *See* 50 U.S.C. § 1705(b); 18 U.S.C. § 844(h)(2). The applicable term of supervised release as to each count is 2 to 3 years, as each is a Class C felony. *See* 18 U.S.C. § 3559(a)(3); U.S.S.G. § 5D1.2(a)(2). Pursuant to 18 U.S.C. § 3624(e), these terms of supervised release must be imposed to run concurrently.

5. The fine range under the Guidelines is $20,000 to $200,000. *See* U.S.S.G. § 5E1.2(c)(3). A statutory special assessment of $100 applies to each felony conviction pursuant to 18 U.S.C. § 3013(a), for a total in this instance of $200.

6. Probation is not authorized.

### F. *Sentence Imposed:*

The Court commits defendant to the custody of the Bureau of Prisons for a period of one hundred and twenty (120) months as to each count, these terms to run consecutively to one another, for a total custody sentence of two hundred forty (240) months.

Pursuant to 18 U.S.C. § 3585(b), defendant will receive credit for time already served in connection with the instant offenses, as computed by the Bureau of Prisons. This credit will include the period between December 1, 2001 and January 22, 2002, while he was in the custody of the United States military.

The Court recommends to the Bureau of Prisons that defendant be designated to a facility, consistent with his security requirements as determined by the Bureau of Prisons, in or near California, so that he may remain reasonably close to his family.

Upon release from confinement, defendant must serve three (3) years of supervised release as to each count, these terms to run concurrently with one another.

As a special condition of supervised release, defendant must maintain full compliance with all of the terms and conditions of the Plea Agreement, including the agreement regarding his continued cooperation with the government,[7] as well as the agreement regarding the assignment to the United States of any profits or proceeds arising from publicity.[8]

---

7. Specifically, under the terms of the Plea Agreement, defendant is required, *inter alia*, (i) "to cooperate fully, truthfully and completely with the United States, and provide all information known to the defendant," (ii) "to testify fully, truthfully and completely at any grand juries, trials or other proceedings, including military tribunals," (iii) "to be available for debriefing by law enforcement and intelligence officers and for pre-trial conferences with prosecutive authorities," (iv) "to provide all documents, records, writings, or materials, objects or things of any kind in the defendant's possession or under the defendant's care, custody, or control relating directly or indirectly to all areas of inquiry and investigation...," and (v) to "submit to polygraph examinations to be conducted by a polygraph examiner of the United States' choice." Plea Agreement, ¶ 9.

Additionally, under the terms of the Plea Agreement, the parties agreed that the gov-

ernment will not seek, and defendant may not receive, a downward departure from the applicable sentencing guidelines, or a reduction of the sentence imposed, based on defendant's cooperation with the government. *See id.;* U.S.S.G. § 5K1.1; Rule 35(b), Fed.R.Crim.P.

8. Specifically, defendant is required to comply with the following provision contained in the Plea Agreement:

The defendant hereby assigns to the United States any profits or proceeds which he may be entitled to receive in connection with any publication or dissemination of information relating-to illegal conduct alleged in the Indictment. This assignment shall include all profits and proceeds for the benefit of the defendant, regardless of whether such profits and proceeds are payable to himself or to others, directly or indirectly, for his benefit or for the benefit of the defendant's associates or a current or

The Court imposes a $200 special assessment, pursuant to 18 U.S.C. § 3013(a), which amount is due and payable immediately.

In light of the defendant's limited assets, the Court declines to impose a punitive fine or an additional fine to cover the costs of incarceration or supervised release.

### G. *Statement of Reasons for the Court's Sentence:*

The 20–year custody sentence imposed today on defendant is just and reasonable given the totality of circumstances. To be sure, there will be many who think the sentence is too lenient, pointing out, as did the father of CIA Agent Spann, who spoke eloquently in the course of the sentencing hearing, that defendant must have played a role in the murder of Agent Spann. In fact, it is clear that the government's exhaustive investigation uncovered no evidence that defendant played any role whatsoever either in Agent Spann's murder or in the planning of the QIJ uprising. Had such evidence existed, the Court

would not have accepted the proffered Plea Agreement.[9]

Moreover, others who believe the 20–year sentence is too lenient may argue that those who "take up arms against the United States" deserve a more severe sentence. Defendant, it appears, denies that he knowingly took up arms against the United States. But this denial aside, the argument that taking up arms against the United States, when that act falls short of treason, requires a sentence more severe than the one provided in the statute is an argument properly addressed to Congress, for while 50 U.S.C. § 1705 broadly proscribes supplying services to certain of this country's adversaries, there is no statute that specifically proscribes taking up arms against the United States and imposes specific appropriate punishments, including perhaps loss of American citizenship. In any event, it is clear that defendant's specific conduct in this case fits well within the charging statutes and it is equally clear that his resulting punishment fits well the crimes the evidence reflects he committed.

future member of the defendant's family. The defendant shall not circumvent this assignment by assigning the rights to his story to an associate or to a current or future member of the defendant's family, or to another person or entity who would provide some financial benefit to the defendant, to the defendant's associates, or to a current or future member of the defendant's family. Moreover, the defendant shall not circumvent this assignment by communicating with an associate or a family member for the purpose of assisting or facilitating their profiting from a public dissemination, whether or not such an associate or other family member is personally or directly involved in such dissemination.

Plea Agreement, ¶ 14.

9. While judges must not become involved in the plea negotiation process (Rule 11(e)(1), Fed.R.Crim.P.), they have a responsibility to review the plea agreement once it is reached,

and to give it careful consideration with an eye to safeguarding the public interest and ensuring fairness to the defendant and the prosecution. *See United States v. Ammidown,* 497 F.2d 615 (D.C.Cir.1973). This is particularly true where the plea agreement contemplates sentencing concessions, for sentencing is the court's responsibility. *See United States v. Gamboa,* 166 F.3d 1327 (11th Cir.1999) (court properly rejected plea bargain on the ground that it did not adequately reflect the seriousness of the offenses committed).

In the instant case, the Court followed precisely this course of action. Thus, the Court carefully reviewed and considered the Plea Agreement, which the parties had submitted to the Court in advance of the plea hearing. After due consideration of the Plea Agreement's terms and the existing record as a whole, the Court, in the exercise of its reasoned discretion, concluded that the Plea Agreement was a fair and just disposition of this prosecution.

There will also be those who consider the 20–year sentence too severe, especially given defendant's youth.[10] Yet, there is, given the nature of defendant's conduct, no persuasive basis for this view. Although young, defendant was legally an adult at the time of the offenses. And, like all adults, defendant must take responsibility for the choices he made. To those who claim that defendant was merely fighting for something that he believed in, it is well to remember, as the Court advised defendant at sentencing, that there is no virtue in fighting for a belief unless that belief is itself virtuous. As defendant now recognizes, the Taliban and its animating ideas were far from virtuous. Importantly, it is also true that defendant did not seek to walk away from the front line or the Taliban after learning that the United States was fighting in Afghanistan and might be threatened by Usama bin Laden and al Qaeda. According to defendant, he might have been killed had he attempted to leave. This rationalization reflects, as the Court stated in the course of sentencing, that it appears defendant was willing to give his life for the Taliban, but not for his country.

In the end, the claims that the 20–year custody sentence is either too lenient or too severe are all unpersuasive. Indeed, that sentence appears in all respects to be just and reasonable and to serve in appropriate measure the various goals of the criminal justice system, namely deterrence, rehabilitation, retribution, and incapacitation.

Accordingly, and for good cause shown, it is hereby **ORDERED** that this Sentencing Memorandum be attached to, and made a part of, the PSIR, pursuant to Rule 32(c)(3)(D), Fed.R.Crim.P.

It is further **ORDERED** that following completion of defendant's cooperation, the government is **DIRECTED** promptly to file a pleading, under seal, advising the Court whether defendant's cooperation has been full, complete and truthful, including the results of any polygraph examinations conducted by the government. The Court will thereafter determine which portions, if not all portions, of this pleading will be made a part of the public record. It is the Court's view that the public has a presumptive right to know whether the government believes that defendant's cooperation has been "full, complete and truthful," as required by the Plea Agreement. Thus, the Court will consider whether there are any extraordinary circumstances, including national security considerations, that militate against disclosure of any part of the government's pleading concerning the truthfulness of defendant's cooperation.

It is further **ORDERED** that a copy of the Plea Agreement, and of the essay written by defendant entitled "Thoughts on the Legitimacy of Suicide Bombings," be attached to, and made a part of, this Sentencing Memorandum.

It is further **ORDERED** that the Clerk is **DIRECTED** to post this Sentencing Memorandum, together with the attached Plea Agreement and essay, on the website for the U.S. District Court for the Eastern District of Virginia.

Copies of this Sentencing Memorandum, and the attached Plea Agreement and essay, shall be issued to all counsel of record, the Probation Office, the Bureau of Prisons and the Marshal's Service.

10. Defendant, born in 1981, was 20 years old when he committed the instant offenses.