TRAXLER, Circuit Judge,
concurring in the denial of rehearing en banc:
In their dissents from the denial of rehearing, my colleagues have appreciated the nature and magnitude of the competing interests at stake here. However, because I believe that their opinions at times have unfairly and inaccurately characterized the panel opinion, I regrettably find myself drawn to offer a few comments in response.[1]
I.
Each of my dissenting colleagues argues that the panel erred in premising its decision on the “admission” that Yaser Esam Hamdi was captured within the boundaries of Afghanistan. Judge Luttig questions whether any such admission was made, at least in the petition, and Judge Luttig and Judge Motz both believe that any such admission should be ineffective because it was made by Hamdi’s father, Esam Fouad Hamdi, acting as Yaser Esam Hamdi’s “next friend,” and not directly by Yaser Esam Hamdi.
A.
I begin with Judge Luttig’s charge that the panel opinion “is unpersuasive, because of its exclusive reliance upon a mistaken characterization of the circumstances of Hamdi’s seizure as ‘undisputed’” because they were not, in his view, “conceded in fact.” As an initial premise, I would point out that the panel decision does not characterize all the circumstances of Hamdi’s seizure as being undisputed. Rather, it characterizes one circumstance of Hamdi’s seizure as undisputed — his presence in Afghanistan while active military operations were being waged by the United States military against the governing Taliban regime. Hamdi’s reason for being in Afghanistan at the time he was seized and the question as to whether he was indeed actively engaged as an enemy to our forces and this country are very much in dispute. The government asserts that Hamdi was in Afghanistan bearing arms as a Taliban soldier when he was seized; Hamdi’s father asserts that Hamdi was only temporarily residing in Afghanistan while engaged in relief work when he was apprehended. Thus, the panel opinion’s observation is in reality limited to the simple fact that “Hamdi was captured in a zone of active combat in a foreign theater of conflict.” Hamdi, 316 F.3d at 459.[2]
As to this more narrow point of disagreement, Judge Luttig correctly ob *346 serves that the habeas petition does not explicitly state that “Hamdi was captured in a zone of active combat in a foreign theater of conflict.” Id. However, from this single pleading omission, Judge Luttig inexplicably leaps to the conclusion that the remaining petition allegations are ambiguous on the question (or, worse, that we should ignore them) and, even more inexplicably, to the belief that when responding to a dissent to a denial for rehearing en banc, the panel has somehow forfeited a right to point to any other pleading or representation filed or otherwise made by the petitioner that supports the observation, unremarkable when made, that Ham-di was indeed in Afghanistan when captured.
First, the petition’s failure to affirmatively state that Hamdi was captured in a foreign combat zone did not and still does not compel me to ignore the other allegations that are present, nor does it cause me to consider that the place of Hamdi’s capture is a matter of dispute. As Judge Wilkinson has pointed out, the petition alleges that “[w]hen seized by the United States Government, Mr. Hamdi resided in Afghanistan.” J.A. 9.[3] Were this the only allegation made, I suppose I could speculate about whether Hamdi had traveled from his “residence] in Afghanistan” to another country “when [and where he was] seized by the United States Government,” but I need not do so. Id. Significantly, the one statement quoted above is not the only allegation made; the petition provides a great deal more information than that. It avers that, following the terrorist attacks on September 11, 2001, “the United States initiated military action against the Taliban Government in Afghanistan,” and that, “in the course of the military campaign, ..., the United States provided military assistance to the Northern Alliance.” J.A. 10. As a result of this military assistance in Afghanistan, the petition states that
the United States obtained access to individuals held by various factions of the Northern Alliance. On information and belief, Mr. Hamdi was captured or transferred into the custody of the United States in the Fall of 2001.
J.A. 10. It goes on to allege that “[o]n or about January 11, 2002, the United States military began transporting prisoners captured in Aghanistan to Camp X-Ray at the United States Naval Base in Guantanamo Bay, Cuba,” and that on or about that same date, “the United States military transferred Yaser Esam. Hamdi to Camp X-Ray, Guantanamo Bay.” J.A. 11.
When we authored the panel opinion, I did not consider these petition allegations to be ambiguous, nor do I today. A plain reading of the submission to us made clear that Esam Fouad Hamdi, as next friend to Yaser Esam Hamdi and as his father, based his claims in large part on the fact that Yaser was seized in Aghanistan in the course of the United States military operations within that country. His contention was that the United States military should release Yaser because he was not in Aghanistan to fight us or our allies and, therefore, was not properly being held as an “enemy combatant” by our military forces.
There was not then and there is not now any reason to be troubled by the lack of an explicit allegation in the petition that Hamdi was seized in a zone of active combat in a foreign theater of conflict, because any possible question about whether the petition was incomplete or uncertain in its intent to allege that Hamdi was actually *347 one of the prisoners captured and detained in Afghanistan would have been eliminated by Hamdi’s Traverse and Response to the government’s motion to dismiss, in which the petitioner engages in his own characterization of the substance of the factual allegations and the claims contained within the petition.
There, the petitioner unequivocally represents that the “claim [does not] implicate Respondents’ initial detention of Petitioner Hamdi in Afghanistan,” but “challenges only his current indefinite imprisonment in the United States Naval Brig in Norfolk, Virginia” and that, because petitioner did not contest the initial detention of Hamdi in Afghanistan, “Hamdi’s claims have no practical consequences for the conduct of the military overseas.” J.A. 64-65.[4] I do not see how the petitioner could be any clearer. He acknowledged that “According to both the Petition and the Mobbs Declaration, Petitioner Hamdi was captured by the Northern Alliance and transferred into the custody of the United States in the Fall of 2001 or late 2001,” J.A. 67 (emphasis added), represented that “[i]n January 2002, Respondents transported Petitioner Hamdi from Afghanistan to Guantanamo Bay, Cuba,” J.A. 69, and complained that Hamdi was being punished by his “isolation] from others similarly situated in Afghanistan and Guantanamo Bay, Cuba.” J.A. 71.[5]
Additionally, as Judge Motz has observed in her dissent, we had been presented in the Joint Appendix with a letter written by Hamdi’s father to United States Senator Patrick Leahy (which petitioner had submitted to the district court). In the letter, Hamdi’s father stated that Yaser had “left our home in Saudi Arabia for Pakistan and then Afghanistan on July 15, 2001 to do relief work in those countries,” “was trapped in Afghanistan once the military campaign began,” and “was caught up *348 in a local dragnet of non-Afghans in Ma-zar-e-Sharif in Afghanistan in November 2001” along with John Walker Lindh. J.A. 153. He was then “kept in [an] Afghanistan jail for 2-3 months prior to being moved to Guantanamo Bay where he stayed for 2 months before they confirmed that he [was] an American citizen, then they moved him to the Norfolk jail.” J.A. 154. At no time was it ever hypothesized that Hamdi might not have been in Afghanistan when he was seized. Indeed, it was affirmatively represented that Hamdi was “caught at the same time Mr. John Walker Lindh was caught” in Afghanistan, but that he was “not [being] treated the same way,” and was not properly determined to be “an enemy combatant.” J.A. 154.[6]
In keeping with affirmative representations made to the court, at no time did anyone on either side of this controversy aver or allege that Hamdi was anywhere other than Afghanistan when he was captured or detained by the Northern Alliance or when he was turned over to the United States military. Judge Luttig has not pointed to a single contrary allegation. Nor did Hamdi’s most capable counsel “gratuitously or foolishly concede that his seizure occurred in a foreign zone of combat,” as Judge Luttig might have us believe. The case has at all times been litigated by counsel based on the consistent position of Hamdi’s father that his son was in Afghanistan and was captured there by our military, but that he was not there as an enemy combatant. Even in his petition for rehearing and rehearing en banc, Esam Hamdi did not assert that Yaser was somewhere other than in Afghanistan when seized; on the contrary, the petition affirmatively acknowledges that Hamdi’s presence in Afghanistan is indeed an “undisputed” fact. The petition seeks a remand in order to allow Yaser Hamdi the opportunity to meet with counsel and contradict the government’s assertion that he was in a zone of combat operations within the country of Afghanistan. Again, the petition seeks to litigate the factual question of why Hamdi was in Afghanistan when he was seized and, more precisely, whether he was actively engaged as an enemy to our forces, not whether he was in Afghanistan during wartime.
I cannot base a decision in so momentous a case on the theoretical possibility that the general allegations in the petition — that the United States obtained access to Hamdi and other prisoners in the custody of the Northern Alliance in Afghanistan and transferred these prisoners “captured in ” to Guantanamo Bay — -are wrong and do not apply to Ham-di’s situation. Indeed, it would be ludicrous for us to somehow presume that they were not intended to be believed. Nor do I know of any precedent that would prompt us here to ignore the factual representations made by the petitioner and counsel in support of the petition. Because the government moved to dismiss the petition, I have assumed the factual allegations of the petition to be true and, for that matter, have accepted the petitioner’s in-court representations regarding how they were intended to be interpreted. I am unfamiliar with any principle that would require us to assume that the factual allegations and in-court representations made by the petitioner and the government are false, and none has been cited to me. Indeed, it would seem inappropriate for us to impute such strange intentions to Hamdi’s father and his counsel. Cf. S. *349 Cross Overseas Agencies v. Wah Kwong Shipping Group Ltd., 181 F.3d 410, 428 n. 8 (3d Cir.1999) (employing a “reasonable reading of the complaint” to supply an allegation not expressly made by the plaintiffs).
Petitioner’s position has remained quite constant throughout this appeal — -that, because Hamdi is an American citizen by birth, he was entitled to meet with appointed counsel in order to contest the factual basis underlying the military’s designation of him as an enemy combatant, as opposed to a peaceful resident, in Afghanistan — once he was removed from the battlefield. We found this position untenable, holding (for a great many reasons which I need not reiterate here) that when an American citizen is captured in an enemy country where we are engaged in active hostilities, we will require no more legal justification than what the government voluntarily provided to us in this case. I am still of the belief that this is the proper and legal course of analysis. And I reject, with little hesitation, this bemusing attempt to rewrite the case history and the substance of the habeas claim placed before us.
B.
I likewise disagree with Judge Luttig’s belief, shared by Judge Motz, that Hamdi’s capture in Afghanistan is not “susceptible to concession in law because Hamdi has not been permitted to speak for himself or even through counsel as to those circumstances.” I am also cited to no authority for the proposition that we should ignore or disbelieve the petitioner’s allegations that Hamdi was taken into military custody in Afghanistan during the combat operations being waged there at the time (whether made expressly in the petition, by implication from its allegations, or by virtue of the petitioner’s representations as to the intended meaning of the allegations) merely because the allegations were not personally written by Yaser Hamdi.
Indeed, a next friend does have the power to admit facts on behalf of the real party in interest, subject to the supervision of the court. See Hall v. Hague, 34 F.R.D. 449, 450 (D.Md.1964). Were it otherwise, a next friend might be compelled to contest every fact which might be relevant, thereby creating unnecessary trouble and expense for the parties and the court. See id. at 449-50. Or, the mere filing of a next friend petition challenging civil disabilities might compel the lifting of such disabilities so that the real party in interest might participate fully in the litigation. The latter possibility is particularly ominous in a case such as this, as it would enable an alleged enemy combatant to disrupt, with no showing whatsoever, safeguards that the Executive has determined are necessary to protect vital national security interests.[7] In sum, I do not believe the panel erred in construing the petition to admit that Hamdi was captured in Afghanistan and in giving effect to that admission.
C.
This brings me, regrettably, to Judge Luttig’s accusation that Judge Wilkinson *350 and I have “attempted] to save the panel opinion by marshaling for the first time today additional support, beyond that relied upon by the panel, for the panel’s conclusion that it has been conceded that Hamdi was seized in a foreign combat zone.” In a series of charges, Judge Lut-tig complains that Judge Wilkinson’s concurrence “makes reference not only to the next friend petition upon which the panel solely relied, ... but also to the new materials cited by the government in its response to the petition for rehearing in support of the court’s conclusion that the location of seizure has been conceded, [including] Petitioner’s Traverse and Response to Respondent’s Motion to Dismiss filed in the district court charges that this is but another example of “the trend in our court to attempt ‘to add to, subtract from, or recharacterize the facts recited and relied upon in a challenged panel opinion,’ ” and presumes that our reliance upon petitioner’s representations made about his petition is but an improper attempt to “shore up” our joint panel opinion because the panel now “senses ... analytical softness of its opinion.”
First, I can state without hesitation that I have no “sense” that our decision is analytically soft at all. On the contrary, the dissent’s failure to point to a single allegation or statement in the record of this case that creates a dispute as to where Hamdi was when he was seized or detained by our allies or our own military forces should end the discussion.
Second, Judge Luttig appears to have forgotten his characterization of our panel opinion as a “challenged panel opinion,” albeit challenged in the form of the dissents written by Judge Luttig and Judge Motz to the full court’s vote not to rehear the case en banc. Judge Luttig’s criticism appears to be premised upon a belief that when panel members write in response to a dissent to a denial of rehearing en banc, it is improper for them to refer to anything in the original record which was not specifically referenced in the panel decision, as this would amount to “supply[ing] ... important new facts or reasoning” not susceptible to appellate review. Such “additional support,” Judge Luttig asserts, became “irrelevan[t] as a matter of law given that they were not relied upon in the panel opinion.”
Obviously, any response by a panel, unanimous at the time the decision was rendered, to a dissent from a denial of rehearing en banc might be construed as an act of bolstering or “shor[ing] up” the published opinion in some sense. Otherwise, there would be nothing to say. Yet, I find no reason to remain silent when our opinion is being misinterpreted. I am confident that neither Judge Wilkinson nor I have informally “modif[ied]” the panel decision which we, along with Judge Wilkins, so painstakingly authored together. It is not my opinion-writing practice to recite every source of information contained within a joint appendix, nor every source directly relied upon in arguments. Indeed, there is rarely, if ever, a need to clutter an opinion with record support for uncontroversial statements that the parties have not contested in their pleadings, responses, briefs, or arguments.
In any event, I see no need to modify the panel opinion because we have pointed to no “important new facts or reasoning.” We observed in the panel opinion that the habeas petition before us for disposition placed Hamdi in an enemy country when he was seized and detained by our military forces as an enemy combatant. In response to Judge Luttig’s charge that the language of the petition does not place Hamdi in Afghanistan at the point of seizure, Judge Wilkinson and I have only gone so far as to point out that any ques *351 tion as to whether we have properly characterized the claims can be laid to rest by petitioner’s own characterization of those allegations. Neither of us has pointed to anything that has not at all times been a part of the record and entirely consistent with the petition’s allegations outlined above.[8]
II.
I turn next to Judge Luttig and Judge Motz’s shared belief that we have placed undue significance on the fact that Hamdi was seized in a foreign combat zone in evaluating the legal sufficiency of the Mobbs Declaration and, by doing so, have somehow paved the way for widespread deprivation of the individual constitutional rights of our citizens.
First, we have not pulled the significance of this simple fact from thin air. It is grounded in the time-honored rule of law in wartime — that all persons residing in an enemy country during hostilities are deemed to be enemies, regardless of nationality. See Juragua Iron Co. v. United States, 212 U.S. 297, 305-06, 29 S.Ct. 385, 53 L.Ed. 520 (1909).“[U]nder the recognized rules governing the conduct of a war between two nations, ... all persons, whatever their nationality, who reside [] [in the enemy country] [are], pending such war, to be deemed enemies of the United States and all of its people.” Id.; see also Lamar v. Browne, 92 U.S. 187, 194, 23 L.Ed. 650 (1875); Young v. United States, 97 U.S. 39, 60, 24 L.Ed. 992 (1877). This is not to say that all persons residing within the enemy country are in fact enemies, or specifically that Hamdi was necessarily an enemy combatant merely because he was in Afghanistan during a conflict between the United States and the Afghan government. But, significant consequences necessarily attached to Hamdi’s presence in Afghanistan; his individual rights stood in tension with the Executive’s wartime powers under Article II. Consequently, the Judiciary became compelled, by the nature of war and by dint of the separation of powers we are required to safeguard and honor, to give deference to the Executive to determine who within a hostile country is friend and who is foe.[9]
*352 Second, Judge Motz and Judge Luttig’s collective fear that our recognition of this time-honored principle might result in innocent journalists or unwitting tourists falling victim to unreviewable military detentions anywhere in the world can be easily laid to rest. Judge Motz, for example, asserts that our decision would allow “any of the ‘embedded’ American journalists covering the war in Iraq or any member of a humanitarian organization working in Afghanistan, [to] be imprisoned indefinitely” by our military, that “any American citizen seized in a part of the world where American troops are present — e.g., the former Yugoslavia, the Philippines, or Korea — could be imprisoned indefinitely, merely by asserting that the area is a zone of active combat,” and the even more extreme “fear that the panel may also have opened the door to the indefinite detention, without access to a lawyer or the courts, of any American citizen, even me captured on American soil, who the Executive designates an ‘enemy combatant,’ as long as the Executive asserts that the area in which the citizen was detained was an ‘active combat zone,’ and the detainee, deprived of access to courts and counsel, cannot dispute this fact.” Judge Luttig also points to “[t]he embedded journalist or even the unwitting tourist” who “could be seized and detained in a foreign combat zone.” And, he too claims that such a likelihood would be “far from infinitesimal where the theater is global, not circumscribed, and the engagement is an unconventional war against terrorists, not a conventional war against an identifiable nation state.”
Although effective in stirring emotion, our colleagues’ expressed fears are grounded in conclusions not reached or even predicted by the panel decision. Our decision does not speak to the issue of whether an “enemy combatant” may challenge the government’s claim that the former Yugoslavia, the Philippines, or Korea is a zone of active military operations for purposes of the President’s exercise of his Article II war powers. Rather, it addresses only the appropriate level of deference to be observed when the President exercised his power to detain an American citizen found within the boundaries of Afghanistan during our military efforts to overthrow its governing regime. Nor does it sanction indefinite detention, but rather contemplates detention for the duration of such hostilities.
In short, my colleagues’ collective desire (albeit undertaken for much different reasons) to redefine the case before us has caused them to lose their focus on our holding. Afghanistan is an identifiable nation state and Hamdi was in a conventional war situation. Every resident within Afghanistan (including Hamdi as was explicitly alleged) was in law an enemy, until determined by the Executive to be a friend. As Judge Wilkinson aptly observed, war is a messy business and mistakes can be made. American journalists and American tourists who venture into a country with whom we are at war without the approval of our military, or who fail to return to this country in time of war, necessarily expose themselves to many risks, including this one. But the circumstances of armed conflict against a foreign government in a foreign land require the deference we have shown the Executive in the making of military decisions.
*353 III.
Despite their common criticism of our observation that Hamdi was captured in Afghanistan — and our belief that Hamdi’s capture in Afghanistan guides our inquiry as to whether the Mobbs Declaration is sufficient to justify Hamdi’s detention as an enemy combatant — our colleagues differ significantly in their opinions as to what kind of review is appropriate.
Judge Motz would hold that the Mobbs Declaration is insufficient to justify Ham-di’s enemy combatant designation. And, although she disagrees that Hamdi’s capture in Afghanistan is undisputed, in the end it really matters not to Judge Motz whether Hamdi was seized in Afghanistan. As Judge Wilkinson has noted, Judge Motz believes it proper for the Judiciary to litigate precisely why Yaser Hamdi was seized and whether the military capture can be justified regardless of where the seizure occurred. In short, Judge Motz “would require a greater showing from the Executive before [she] would permit an American citizen, held in the United States, to be imprisoned indefinitely, without ever being afforded the opportunity to appear in court, contest the allegations against him, or consult with a lawyer.” For the reasons expressed by Judge Wilkinson, I, of course, disagree.
Judge Luttig also contests our observation that Hamdi was present in Afghanistan when he was captured, but only pays lip service to Judge Motz’s belief that we would have to give Hamdi access to counsel and a direct voice in an Article III court in order to determine his place of seizure. Unlike Judge Motz, it appears that Judge Luttig would in practice not give Hamdi a voice to either concede or dispute the place of seizure. Rather, Judge Luttig “believefs]” he would adopt at most a “some evidence” standard as the appropriate level of deference due and “would likely conclude, as argued by the United States, that the facts recited in [the Mobbs’ Declaration] are sufficient” to satisfy it. In other words, it seems Judge Luttig would hold that the Mobbs Declaration is sufficient to justify Hamdi’s enemy combatant designation regardless of whether Hamdi admitted his presence in Afghanistan or flatly disputed it.
From this, I can only assume that Judge Luttig is really dissatisfied not because we have refused to give Hamdi a voice to raise a dispute as to his place of seizure, but because we evaluated the legal sufficiency of the government’s response within the context of Hamdi’s capture in Afghanistan. Thus, Judge Luttig charges, by “refusing] to rest decision on the proffer made by the President of the United States” and instead “resting] decision on a putative concession by the detainee,” we have “all but eviscerate[d] the President’s Article II power to determine who are and who are not enemies of the United States during times of war.” He accuses us of “disown[ing] [our] promise to the Executive to accord him the substantial deference to which he is constitutionally entitled for his wartime decisions as to who constitute enemies of the United States,” and predicts that our rule “will henceforth ... cast the Judiciary as ultimate arbiter, in each and every instance, of whether the Executive has properly so classified a detainee.” “[I]n every instance in which the [habeas] petitioner refrains from affirmative concession that he was seized in a foreign combat zone,” Judge Luttig laments, “counsel must now be provided and judicial review had of the Executive’s determination that one is an enemy combatant.” Such hyperbole is not only unwarranted, it is plainly wrong.
Judge Luttig’s first misrepresentation lies in his characterization of our opinion as holding that “more is ‘unnecessary to a *354 meaningful judicial review’ of a challenge to an Executive’s enemy combatant designation than a concession of seizure in a foreign combat zone.” We-have held no such thing, nor can such be fairly read from our opinion. The inaccuracy of this “paraphrased rendition” of our holding is readily apparent. The language quoted by Judge Luttig from the panel opinion is excised from the following passage from our opinion which follows an extensive discussion of the contents of the Mobbs Declaration and the practical problems of active judicial supervision of combat operations overseas:
[Bjecause Hamdi was indisputably seized in an active combat zone abroad, we will not require the government to fill what the district court regarded as gaps in the Mobbs affidavit. The factual averments in the affidavit, if accurate, are sufficient to confirm that Hamdi’s detention conforms with a legitimate exercise of the war powers given the executive by Article II, Section 2 of the Constitution and ... is consistent with the Constitution and laws of Congress. Asking the executive to 'provide more detailed factual assertions would be to wade further into the conduct of war than we consider appropriate and is unnecessary to a meaningful judicial review of this question.
Id. 316 F.3d at 473 (emphasis added) (citations omitted). Obviously, we did not hold that Hamdi’s concession of seizure in a foreign combat zone rendered further judicial inquiry into an enemy combatant designation unnecessary. For the constitutional and practical reasons extensively discussed in the opinion, we held that Hamdi’s presence in a war zone when seized rendered judicial inquiry beyond the legal sufficiency of the government’s response unnecessary to a meaningful judicial review.
Indeed, we expressed no opinion as to whether the Mobbs Declaration was more than sufficient or just enough to ensure meaningful judicial review of the Executive’s detention of an American citizen in an enemy country as an enemy combatant. The submission of the Mobbs Declaration was not directed by the Judiciary. Rather, the government voluntarily opted to provide, under oath, a level of information it believed to be legally sufficient to justify detention of an American citizen captured during the course of armed conflict in a foreign theater of battle, and asked us to respect the balance of powers and accept it as sufficient to warrant dismissal of the petition before us. And, we did indeed accept the Executive’s voluntary proffer as sufficient. We took care not to make grand pronouncements as to what we might do in a different case, and even went so far as to expressly discourage any propensity on the part of others to view our decision as moving beyond the set of circumstances before us. Judge Luttig decries what he believes to be a “Pyrrhic victory” for the government, but it has lost nothing. Even if we assume that the government sought such a broad holding, the most that can be said is that they did not get all they wanted and must seek it elsewhere.
Judge Luttig’s second misrepresentation comes in the form of the prediction that, as a result of our opinion, “in every instance in which the [habeas] petitioner refrains from affirmative concession that he was seized in a foreign combat zone,” “counsel must now be provided and judicial review had of the Executive’s determination that one is an enemy combatant.” Our opinion says no such thing. We held that the Mobbs Declaration was sufficient to allow meaningful judicial review of Hamdi’s detention because he was within a hostile country when captured. We did not predict what would constitute meaningful judi *355 cial review of the detention of an United States citizen in cases in which the place of seizure is unknown or alleged to be within a country with whom we are not actively at war. Although we left open the possibility that the place of seizure might require further factual inquiry depending upon what representations the government provided, we did not hold that extended judicial review of the Executive’s determination that one is an enemy combatant would become appropriate merely because a dispute existed as to the place of capture. Nor for that matter, did we even hold that the Mobbs Declaration would have been insufficient had the place of capture been in dispute in this case. Our opinion dealt, as it should, with the precise situation before us.
IV.
Finally, while I fully recognize that we have not gone as far as Judge Luttig would have us go, I take umbrage at his charge that this panel, as a result of “deci-sional paralysis,” has “retreated” from its constitutional duty to decide this case based upon the facts presented and, instead, has fabricated a fact to ease our task. Nothing could be further from the truth. The government makes no such charge, no doubt cognizant that, in accordance with time-honored principles of constitutional decision-making, we have gone no further than necessary to resolve the delicate balance of constitutional interests before us. See Poe v. Ullman, 367 U.S. 497, 503, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (“The best teaching of this Court’s experience admonishes us not to entertain constitutional questions in advance of strictest necessity”) (quoting Parker v. County of Los Angeles, 338 U.S. 327, 333, 70 S.Ct. 161, 94 L.Ed. 144 (1949)); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (“The Court will not ‘anticipate a question of constitutional law in advance of the necessity of deciding it.’”) (quoting Liverpool, N.Y. & Phila. Steamship Co. v. Emigration Commissioners, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885)); id. (“The Court will not ‘formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.’”). Burton v. United States, 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1905) (“It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.”). Nor, for that matter, does the petitioner, who argues not that Yaser’s presence in Afghanistan was a matter of dispute, but only that we should not as a legal matter rely upon the allegations of the petition and the representations of the petitioner for the premise that Yaser was in an active combat zone within that country.
Nor is it fair to say that we “retreated to ground that ... neither party attempted to defend.” The government has recognized the significance of the place of capture from the outset of this case, arguing to us that “[t]he military determination at issue in this case — the decision to detain someone who was armed with an assault rifle when he surrendered in a combat zone as part of an enemy unit — directly implicates the national defense, not to mention the safety of American soldiers still stationed in the zone of conflict, and falls at the heart of the military’s ability to conduct war.” Respondents’ Brief at 27. So has the petitioner, who has repeatedly disclaimed any intent to challenge a battlefield seizure in Afghanistan, but only Ham-di’s current detention in the United States.
This ease was presented to us on appeal from the district court’s order finding that the Mobbs Declaration was insufficient to *356 allow meaningful judicial review of Ham-di’s classification as an enemy combatant. We held that the Mobbs Declaration provided by the government in response to the habeas petition was sufficient to uphold Hamdi’s detention as an enemy combatant under the President’s wartime powers. We have upheld the President’s Article II power as Commander in Chief of the armed forces to defend this country from its enemies and to determine who are and who are not enemies of the United States within countries where we are engaged in active hostilities.
Yaser Hamdi’s status as an American citizen entitles him to petition the Judiciary personally, or by next friend if he cannot for reasons of national security, for habeas relief and thereby to demand a response from the Executive as to why the detention is an acceptable utilization of his Article II powers. In the exercise of our Article III powers, we review that response and may consider any legal arguments as to why the detention does not comport with a lawful exercise of war powers. Because Hamdi was within a country with whom we were fighting when he was seized, principles of separation of powers and practicalities of armed conflict dictate that we defer to the Executive’s determination as to who is foe and who is not. Hamdi may test the legal basis for his detention. But, beyond that, Hamdi may be held, not indefinitely, but for the duration of active hostilities just like other non-citizen detainees captured in an enemy country by our military forces making a battlefield determination that the person detained was there to take up arms against our soldiers. And, in the holding most overlooked but most directly applicable to the claim as it was filed and argued before us, Hamdi’s transfer by the military from the enemy country to Guantanamo Bay and then to the United States did not result in a greater right to challenge his designation.
In the end, Judge Luttig complains not because we accepted the Mobbs Declaration as sufficient and, thereby, granted the President the deference he sought from us. Rather, he complains because we have not forecast a similar level of deference in other contexts by adopting a global standard of review for all Executive detentions undertaken in the “war against terror.” But, in order to reach this broader holding, he must attempt to find fault with our observation that Hamdi was in Afghanistan when seized, and he must characterize, however inaccurately, our opinion as resting solely upon that observation.
The impropriety of reaching beyond this case to decide another is, in my view, quite obvious. Judge Luttig opines that he would probably adopt the “some evidence” standard advanced by the government and hold that the Mobbs Declaration would be sufficient even in the face of a factual dispute as to whether Hamdi was in Afghanistan. That question, however, does not merely raise a single difficult issue, as posited by Judge Luttig, as to what the global standard should be for this and other cases. Rather, it raises many difficult issues related to the President’s Article II wartime powers and how they will ultimately be interpreted in an age of terror. And, no matter how interesting such questions may be, they are simply not before us. We are not dealing with the President’s designation of Hamdi as an enemy combatant because he is a terrorist in the “war against terror” declared after the tragic events of September 11, 2001. Had Hamdi’s petition been grounded in an allegation that he was seized in France under the auspices of the “war against terror,” and had the military agreed to that allegation and designated him an enemy combatant, then we would have a much *357 different case. Had Hamdi’s petition been grounded in an allegation that he was seized in the United States under the auspices of the “war against terror,” and the government agreed, then we would have a case not unlike Padilla v. Rumsfeld.[10] In both hypothetical situations, we might well be called upon to weigh other important national security interests. Whereas we would not likely face the dilemma of pulling military commanders out of the theater of war to testify in a court of law, for example, we would likely encounter such issues as whether France or the United States is a “zone of active military operations” and, if not, whether such seizures in a noncombat country can be a valid exercise of the Executive’s Article II war power.
I need express no opinion on such issues because they are not before us. As the government’s response to the petition makes clear, we are dealing with the President’s designation of Hamdi as an enemy combatant in the war against Afghanistan with the stated goal of ousting the Taliban regime in order to end its support for A1 Qaida and other terrorist networks. The conflict in Afghanistan is certainly related to the global conflict referred to as the “war against terror,” but it is unquestionably a military conflict that falls quite neatly within our historical concepts of war. The questions Judge Luttig wishes to address might include some of the more novel, complex, and interesting ones a court could be called upon to contemplate, but no matter how much we might like to deal with them, they are not before us. We should not reach beyond this case to decide them.

. Because Judge Wilkinson has already written eloquently, and primarily, in response to Judge Motz’s dissent, I focus my comments chiefly on matters raised by Judge Luttig.

. See also Hamdi, 316 F.3d at 460 (noting that the petitioner "acknowledged] that Hamdi was seized in Afghanistan during a time of active military hostilities”) (emphasis added); id. at 461 (noting that it was "undisputed that Hamdi was captured in Afghanistan during a time of armed hostilities there”) (emphasis added); id. at 474 (noting that ' 'Hamdi’s petition places him squarely within the zone of active combat”) (emphasis added); id. at 476 (noting that "it is undisputed that [Hamdi] was captured in a zone of active combat operations”).

. According to later representations made by his father, Hamdi left "Saudi Arabia for Pakistan and then Afghanistan on July 15, 2001 to do relief work in those countries,” and became "trapped in Afghanistan once the military campaign began.” J.A. 153.

. We have also been challenged for our alleged "altered and paraphrased rendition” of the petition's allegation concerning the location of Hamdi's seizure. We did interpret the petition as alleging that " ‘Hamdi was captured or transferred into the custody of the United States in the Fall of 2001’ in Afghanistan." Hamdi, 316 F.3d at 460 (emphasis added); see J.A. 10. But, even if we assume that the petition was ambiguous on this point, we did not "suppl[y] a geographical location of [Hamdi’s] seizure and detention” nor "im-put[e] a representation as to this location to the next friend,” as charged by Judge Luttig; the next friend supplied the geographical location. Any ambiguity as to whether Hamdi was captured or transferred to the United States military in Afghanistan was likewise cleared up by the next friend's own characterization of his claim.

. Consistent arguments were also made to this court. For example, Hamdi argued that no deference was due the Respondents because, inter alia, "Hamdi’s claims do not challenge the conduct of foreign policy, military decision-making, or even the propriety of his initial detention in Afghanistan,” but instead challenge "the legality of his indefinite detention in a Norfolk naval brig without due process.” Appellees' Brief at 27. Later, it was again represented that "Hamdi’s claims do not require review of Respondents’ prosecution of the war effort. As noted earlier, Hamdi's claims do not seek judicial review of the Executive Branch's conduct overseas.” Appellees’ Brief at 40. At yet another point, Hamdi argued that the "Respondents [had] mischaracteriz[ed] Hamdi's claims as an effort to 'second-guess[ ] the military determination’ of his enemy combatant status,” representing that "[o]n the contrary, the underlying claims in this case are designed to test the legality of Hamdi’s imprisonment in a naval brig in Norfolk, Virginia, not a military determination made overseas....” Ap-pellees' Brief at 44. And, during oral argument, Hamdi again clarified that he was not challenging the legality of his initial seizure and detention in Afghanistan as an enemy combatant, but rather was only asserting that as one moves away from a foreign battlefield to the United States where civil courts are open and functioning, the deference due to the military’s battlefield decision decreases.

. See United States v. Lindh, 227 F.Supp.2d 565 (E.D.Va.2002); United States v. Lindh, 212 F.Supp.2d 541 (E.D.Va.2002); United States v. Lindh, 198 F.Supp.2d 739 (E.D.Va.2002).

. The cases cited by Judge Motz do not compel a contrary conclusion. See White v. Miller, 158 U.S. 128, 146, 15 S.Ct. 788, 39 L.Ed. 921 (1895); Kingsbury v. Buckner, 134 U.S. 650, 680, 10 S.Ct. 638, 33 L.Ed. 1047 (1890); Stolte v. Larkin, 110 F.2d 226, 233 (8th Cir.1940). The cases do not translate to a holding that the court, as opposed to the next friend, is charged with the duty to rewrite a claim brought by a next friend on behalf of a military detainee so as to assure its survival. Here, there is no reason to believe that rights are being bargained away or that a factual mistake is being made. There is surely no doubt as to the nature of the claim before us.

. For this reason, I also think it misleading to characterize the Traverse and Leahy letter as "new materials cited by the government in response to the petition for rehearing in support of the court’s conclusion that the location of seizure has been conceded.” These materials have been in the district court record and in the Joint Appendix since the inception of the appeal, and have been referred to by the parties throughout this litigation. There is nothing “new” about them.
With specific regard to Esam Hamdi’s letter to Senator Leahy, we are additionally confronted by Judge Motz's view that it was improperly “ignored” by us and Judge Luttig's belief that it should have been ignored because it is "obviously irrelevant” to the issue. We considered everything submitted by the parties in the Joint Appendix and all of the arguments when authoring our joint opinion. We did not ignore the Leahy letter or find it to be "obviously irrelevant.” The letter was presented to the district court by Hamdi’s counsel, along with several other documents. The panel did not expressly cite to the letter to support the observation that Yaser Esam Hamdi was captured in a combat zone. But, like the Traverse (and other representations made below and at oral argument before this court), the Leahy letter was perfectly consistent with the unremarkable observation which we drew from the allegations of the petition before us and as they had been represented to us, i.e., that Hamdi was indeed in Afghanistan when he was seized. It certainly did not raise any ambiguity in the petition concerning Hamdi’s location when he was seized.

. In his petition for rehearing and rehearing en banc, petitioner argued it could only be said to be undisputed that Hamdi was in a zone of active combat operations if the entire country of Afghanistan is such a zone at the time of capture. I have no problem with this view. The United States is in a sanctioned military operation designed to oust from pow *352 er the governing regime of the country of Afghanistan. Just as we "are ill-positioned to police the military's distinction between those in the arena of combat who should be detained and those who should not,” Hamdi, 316 F.3d at 474, we are ill-positioned to question the military’s determination that any particular area of a country with whom we are at war is or is not an "active combat zone.”

. See Padilla v. Rumsfeld, 243 F.Supp.2d 42 (S.D.N.Y.2003); Padilla v. Bush, 233 F.Supp.2d 564 (S.D.N.Y.2002).